**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

PABLO ESPIN et al.,
*Plaintiffs-Appellees,*

v.

CITIBANK, N.A.,
*Defendant-Appellant,*

Appeal from Order of the United States District Court for the
Eastern District of North Carolina, No. 5:22-cv-00383-BO-RN
(Boyle, J.)

## APPELLANT'S OPENING BRIEF

Lucia Nale
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8886

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Attorneys for Defendant-Appellant Citibank N.A.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _23-2083_   Caption: _Espin et al. v. Citibank, N.A._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Citibank, N.A._
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?                      ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

       Citibank, N.A. is a wholly owned subsidiary of Citicorp LLC. Citicorp LLC is a wholly owned
       subsidary of Citigroup Inc.


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                          ☑ YES ☐ NO
       If yes, identify all such owners:

       Citibank, N.A. is a wholly owned subsidiary of Citicorp LLC. Citicorp, LLC is a wholly owned
       subsidary of Citigroup Inc.  Citigroup Inc. is a publicly traded corporation and has no parent
       corporation.   There is no publicly held corporation that owns more than 10% of Citigroup Inc.'s
       stock.

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew J. Pincus _____       Date: 1/25/2024

Counsel for: Citibank, N.A. _____

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 6

STATEMENT OF ISSUES ................................................................. 6

STATEMENT OF THE CASE ............................................................ 8

A. Statutory and Regulatory Background.......................... 8

    1. *The Federal Arbitration Act* ................................. 8

    2. *The Servicemembers Civil Relief Act* ................. 10

    3. *The Military Lending Act* ................................... 11

B. Factual Background ...................................................... 14

C. Proceedings Below ........................................................ 18

SUMMARY OF ARGUMENT ........................................................ 21

STANDARD OF REVIEW................................................................ 25

ARGUMENT .................................................................................... 26

I. The SCRA Does Not Bar Arbitration Of Plaintiffs' Claims........... 27

    A. The SCRA Does Not Displace The FAA. .............................. 27

        1. *The SCRA's text does not override the FAA.* ................. 27

        2. *The SCRA's statutory context confirms that Congress did not intend to displace the FAA.* .............. 36

        3. *The district court erred by invoking* Lyons. ................. 39

    B. The 2019 Amendment Does Not Apply Retroactively To Invalidate Arbitration Agreements Entered Into Before Its Enactment........................................................ 42

    C. The District Court Erred In Relying On The Arbitration Agreement's Severability Clause To Deny Arbitration. ....... 47

    D. The SCRA Does Not Bar Arbitration Of Plaintiffs' Non-SCRA Claims. ................................................... 50

i

II.   The MLA Does Not Bar Arbitration Of Plaintiffs' Claims............52

A.   In The Credit Card Context, An "Extension Of Consumer Credit" Occurs Only Upon The Opening Of The Credit Card Account. ...................................................53

1.   *The MLA regulations make clear that an "extension of consumer credit" does not occur with each use of a credit card.* ...............................................54

2.   *The Department of Defense's statements in connection with issuance of the 2015 regulation confirm that the "extension of consumer credit" occurs only when the account is opened.* ......................57

3.   *American Express Co. v. Koerner provides no support for Plaintiffs' position*....................................61

B.   The MLA's Reference to "Covered" Borrowers Is Irrelevant................................................................62

III.  The Arbitration Agreements Are Valid Under State Law. ............64

A.   The Agreements Do Not Violate Public Policy....................65

B.   The Agreements Are Not Unconscionable. ...........................67

CONCLUSION ....................................................................................69

REQUEST FOR ORAL ARGUMENT ....................................................71

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Bruce Terminix Companies, Inc. v. Dobson,*
    513 U.S. 265 (1995) ............................................................... 43

*Am. Express Co. v. Italian Colors Rest.,*
    570 U.S. 228 (2013) ............................................................... 44

*Am. Express Co. v. Koerner,*
    452 U.S. 233 (1981) ............................................................... 61

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ..................................................... *passim*

*Bakery & Confectionary Union & Indus. Int'l Pension Fund
v. Just Born II, Inc.,*
    888 F.3d 696 (4th Cir. 2018) ............................................. 25

*Beckwith v. Caliber Home Loans,*
    2015 WL 3767187 (N.D. Ala. June 17, 2015) ................... 44

*Benedict v. Hewlett-Packard Co.,*
    2016 WL 1213985 (N.D. Cal. Mar. 29, 2016) ................... 30

*Blackwell v. Bank of Am. Corp.,*
    2012 WL 1229675 (D.S.C. Apr. 12, 2012) ......................... 44

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ............................................................... 42

*Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.,*
    807 F.3d 553 (4th Cir. 2015) ............................................... 6

*CompuCredit Corp. v. Greenwood,*
    565 U.S. 95 (2012) ....................................................... *passim*

*Coneff v. AT&T Corp.,*
    673 F.3d 1155 (9th Cir. 2012) ........................................... 50

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Convergys Corp. v. NLRB,*
866 F.3d 635 (5th Cir. 2017)............................................................ 30

*Coppok v. Citigroup, Inc.,*
2013 WL 1192632 (W.D. Wash. Mar. 22, 2013) ................................ 69

*Cruz v. Cingular Wireless,*
648 F.3d 1205 (11th Cir. 2011).................................................... 49, 50

*Davidson v. United Auto Credit Corp.,*
65 F.4th 124 (4th Cir. 2023) ............................................................ 11

*Davies v. Green Tree Servicing,*
2015 WL 3795621 (M.D. Penn. June 18, 2015)................................. 44

*Dean Witter Reynolds, Inc. v. Byrd,*
470 U.S. 213 (1985)......................................................................... 51

*Dumanis v. Citibank (S. Dakota), N.A.,*
2007 WL 3253975 (W.D.N.Y. Nov. 2, 2007) ............................... 68, 69

*E. Assoc. Coal Co. v. United Mine Workers of Am.,*
531 U.S. 57 (2000)........................................................................... 66

*Epic Sys. Corp. v. Lewis,*
138 S. Ct. 1612 (2018)........................................................... *passim*

*Gordon v. Pete's Auto Service of Denbigh, Inc.,*
637 F.3d 454 (4th Cir. 2011)........................................................ 46, 47

*Henderson v. Masco Framing Corp.,*
2011 WL 3022535 (D. Nev. July 22, 2011) ...................................... 44

*Kindred Nursing Ctrs. Ltd P'ship v. Clark,*
581 U.S. 246 (2017)......................................................................... 65

*KPMG LLP v. Cocchi,*
565 U.S. 18 (2011)........................................................................... 51

iv

*Lamps Plus, Inc. v. Varela,*
139 S. Ct. 1407 (2019)...................................................................26

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994).............................................................42, 45

*Larsen v. Citibank FSB,*
871 F.3d 1295 (11th Cir. 2017)...........................................68

*Lyons v. PNC Bank,*
26 F.4th 180 (4th Cir. 2022) ...........................39, 40, 41, 42

*Marmet Health Care Ctr., Inc. v. Brown,*
565 U.S. 530 (2012)...............................................................65

*In re Marriott Int'l Customer Data Sec. Breach Litig.,*
78 F.4th 677 (4th Cir. 2023) ...............................................30

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983)......................................................................9

*Muriithi v. Shuttle Exp., Inc.,*
712 F.3d 173 (4th Cir. 2013)...............................................25

*Nygaard v. Sioux Valley Hosps. & Health Sys.,*
731 N.W.2d 184 (S.D. 2007)...............................................67

*Perry v. Thomas,*
482 U.S. 483 (1987)...............................................................43

*Robertson v. Intratek Computer, Inc.,*
976 F.3d 575 (5th Cir. 2020)................................32, 33, 34

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
490 U.S. 477 (1989)...............................................................66

*Rossi Fine Jewelers, Inc. v. Gunderson,*
648 N.W.2d 812 (S.D. 2002)...............................................65

# TABLE OF AUTHORITIES
## (continued)

*Samenow v. Citicorp Credit Servs., Inc.*,
    253 F. Supp. 3d 197 (D.D.C. 2017) ...................... 68

*Schwalm v. TCF National Bank*,
    226 F. Supp. 3d 937 (D.S.D. 2016) ..................... 69

*Snow v. Citibank, N.A.*,
    2015 WL 799543 (E.D.N.C. Feb. 25, 2015) ............ 65

*Summer Rain v. Donning Co./Publishers, Inc.*,
    964 F.2d 1455 (4th Cir. 1992) ........................... 51

*U1it4Less v. Fedex Corp.*,
    2015 WL 3916247 (S.D.N.Y. June 25, 2015) ............ 30

*Weller v. HSBC Mortg. Servs.*,
    971 F. Supp. 2d 1072 (D. Colo. 2013) ................. 44

**Statutes**

9 U.S.C. § 2 ............................................. 9, 43

9 U.S.C. § 16(a)(1)(B) .................................... 6

9 U.S.C. § 401(2) ....................................... 35

10 U.S.C. § 987 ..................................... 60, 62

10 U.S.C. § 987(a) ...................................... 11

10 U.S.C. § 987(b) .................................. 11, 56

10 U.S.C. § 987(c)(1) ............................... 12, 56

10 U.S.C. § 987(e) .................................. 12, 57

10 U.S.C. § 987(e)(3) ............................... *passim*

10 U.S.C. § 987(f)(1) ............................... 12, 57

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

10 U.S.C. § 987(f)(4) .................................................. 7, 12, 52, 62

10 U.S.C. § 987(f)(5) .................................................................. 12

10 U.S.C. § 987(h) ............................................................... 13, 52

10 U.S.C. § 987(i)(1) ................................................................ 62

10 U.S.C. § 987(i)(6) ................................................................ 13

15 U.S.C. § 1639c(e)(1) ........................................................... 40

15 U.S.C. § 1639c(e)(2) ........................................................... 40

15 U.S.C. § 1639c(e)(3) ...................................................... 40, 41

15 U.S.C. § 1679c(a) ................................................................ 31

15 U.S.C. § 1679f(a) ................................................................ 31

28 U.S.C. § 1331 ........................................................................ 6

28 U.S.C. § 1367(a) ................................................................... 6

41 U.S.C. § 4712 ..................................................................... 32

41 U.S.C. § 4712(c)(2) ............................................................ 33

41 U.S.C. § 4712(c)(7) ............................................................ 33

50 U.S.C. app. § 597a .............................................................. 46

50 U.S.C. § 3937(a)(1)(A) .................................................. 10, 11

50 U.S.C. § 4042 ..................................................................... 11

50 U.S.C. § 4042(a) .......................................................... *passim*

50 U.S.C. § 4042(a)(3) ..................................................... *passim*

*Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021*, Pub. L. No. 117-90, 136 Stat. 26 ............... 45

*National Defense Authorization Act for Fiscal Year 2020,* Pub. L. No. 116-92, 133 Stat. 1198 ...................................................... 37

## Rules and Regulations

32 C.F.R. § 232.3(g)(1) ........................................................... 63

32 C.F.R. § 232.5(b)(2)(i)(B) ........................................... 55, 56

32 C.F.R. § 232.5(b)(3) ...................................... 13, 55, 56, 59

32 C.F.R. § 232.8 ...................................................................... 62

32 C.F.R. § 232.9(d) ............................................................... 63

32 C.F.R. § 232.13(c)(1) .................................................. 13, 53

Fed. R. Civ. P. 3 ...................................................................... 29

## Other Authorities

72 Fed. Reg. 50,580 (Aug. 31, 2007) ................................... 13

79 Fed. Reg. 58,602 (Sept. 29, 2014) .............................. 58, 60

80 Fed. Reg. 43,560 (July 22, 2015) ........... 14, 53, 55, 57, 59, 64

Cong. Rsrch. Serv., *The Servicemembers Civil Relief Act (SCRA): Section-by-Section Summary*, R45283 (Feb. 9, 2021) ..................................................................................... 10

*National Defense Authorization Act for Fiscal Year 2020,* S. Bill 1790 (116th Cong.) (Sept. 17, 2019) ............................ 36

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*National Defense Authorization Act for Fiscal Year 2020,*
*Conference Report to Accompany S. 1790*, S. Rep. No. 116-
333 (Dec. 9, 2019).................................................................38

*National Defense Authorization Act for Fiscal Year 2022,*
H.R. Rep. 4350 (117th Cong.) (Oct. 18, 2021) ....................39

U.S. Gov't Accountability Office, *Servicemember Rights:*
*Mandatory Arbitration Clauses Have Affected Some*
*Employment and Consumer Claims but the Extent of*
*Their Effects is Unknown* (Feb. 2021) ..........................37, 38

# INTRODUCTION

The central questions in this case involve the interaction of three federal statutes: the Federal Arbitration Act (FAA), the Servicemembers Civil Relief Act (SCRA), and the Military Lending Act (MLA). The FAA protects the enforceability of arbitration agreements—including agreements to arbitrate on an individual basis. The SCRA and MLA provide important, but limited, protections for military servicemembers in connection with their financial transactions. They do not bar enforcement of Plaintiffs' arbitration agreements.

Citibank, N.A. (Citibank) deeply respects our Nation's servicemembers and is grateful for the sacrifices they have made to keep the Nation safe.

As part of its commitment to supporting the military, Citibank provides extensive benefits to servicemembers and their families—benefits that go beyond the requirements of the SCRA. Most relevant to this case, while the SCRA prohibits creditors from charging more than a six-percent interest rate on debts incurred by individuals before they become active-duty servicemembers, Citibank reduces the interest rate during active-duty service to *zero percent* both on those pre-service debts

and any debts incurred during service. Citibank also waives all fees on pre-service balances while the servicemember is on active duty.

Plaintiffs are Citibank credit card customers who allege that Citibank's benefits program for servicemembers violates the SCRA and MLA. The complaint alleges that Citibank restores the interest rates and fee schedules applicable to all of its customers once the servicemembers return to civilian life, and that doing so violates the SCRA. Citibank vigorously denies Plaintiffs' arguments on the merits; its program is *more* generous to servicemembers than the law requires.

But the relevant question on this appeal is whether Plaintiffs must honor their agreements to arbitrate the claims in this case.

It is undisputed that, when Plaintiffs opened their credit card accounts, they accepted cardholder agreements requiring arbitration on an individual basis. It is also undisputed that Plaintiffs had the opportunity to opt out of arbitration, but chose not to do so.

The key questions on appeal are whether the SCRA or MLA displace the FAA's otherwise-applicable mandate that Plaintiffs' arbitration agreements be enforced in accordance with their terms.

The district court denied Citibank's motion to compel arbitration, agreeing with Plaintiffs that the 2019 amendment to the SCRA invalidated the arbitration clauses. The district court was wrong in its reading of the SCRA, for multiple reasons.

To begin with, the Supreme Court has held that the party arguing that another federal statute displaces the FAA's protection of agreements for individual arbitration must demonstrate a "clear and manifest congressional command to displace" the FAA's protections. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quotation marks omitted).

The SCRA does not come close to meeting this standard. The provision on which Plaintiffs rely—Section 4042(a)(3)—does not mention arbitration at all, much less override the FAA. Rather, the provision requires that, for those cases properly brought in court, parties cannot agree to waive class procedures. That is a far cry from the clear and express statement required to displace the FAA's protection of arbitration agreements.

Moreover, even if Section 4042(a)(3) did contain such express language, it would not apply to Plaintiffs here, because it was enacted in 2019, well after Plaintiffs entered into their arbitration agreements

(between 2013 and 2016). Nothing in the provision suggests that Congress intended it to apply retroactively, and in the absence of clear language exhibiting that intent, the presumption against retroactivity governs. Finally, even if Plaintiffs were correct that the SCRA does override the FAA *and* applies retroactively, their non-SCRA claims would still be fully arbitrable.

In the district court, Plaintiffs also contended that the MLA forecloses enforcement of their arbitration agreements. The district court did not reach this argument, but Plaintiffs may rely on it in this Court—and it is wrong. The MLA prohibits including arbitration provisions in contracts involving "extension[s] of consumer credit." 10 U.S.C. § 987(e)(3). Under the Department of Defense (DoD) regulations implementing the MLA, credit cards were excluded from the definition of "consumer credit" until October 3, 2017. Moreover, as DoD regulations make clear, the "extension of consumer credit" in connection with a credit card account occurs only when an account is first opened. Here, the four named Plaintiffs opened their credit card accounts with Citibank before October 2017—and the DoD regulation expanding the MLA to encompass

credit card accounts expressly states that the MLA does not apply retroactively.

Recognizing this fatal flaw in their argument, Plaintiffs argued below that there is an "extension of consumer credit" each time they use their credit cards, and that, because they used their credit cards after the DoD regulation's October 2017 effective date, the MLA's prohibitions of arbitration apply to their agreements. That interpretation is inconsistent with DoD's regulations and DoD's explanation of its regulations. It also would make it impossible for credit card issuers to comply with the MLA, triggering the risk of criminal sanctions.

Finally, Plaintiffs were wrong in contending below that the arbitration agreements violate public policy or are unconscionable under applicable state law. Plaintiffs face a heavy burden to invalidate the arbitration agreements on these grounds. But they offer only cursory arguments that have been rejected by multiple courts and, in addition, are preempted by the FAA.

The FAA protects arbitration agreements for good reason. As the Supreme Court has repeatedly recognized, Congress determined that

arbitration provides a fair, swift, and efficient means of dispute resolution that is simpler to use than litigation in court.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction of Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).

Section 16 of the FAA "authorizes interlocutory appeals from a district court's refusal to . . . compel arbitration under Section 4 of the FAA." *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 561 (4th Cir. 2015) (citing 9 U.S.C. § 16(a)(1)(B)).

The district court denied Citibank's motion to compel arbitration, JA300, and Citibank timely filed its notice of appeal, JA307. This Court therefore has jurisdiction.

## STATEMENT OF ISSUES

The Servicemembers Civil Relief Act was amended in 2019 to provide that "[a]ny person aggrieved by a violation . . . may in a civil action . . . be a representative party on behalf of members of a class or be a member of a class, in accordance with the Federal Rules of Civil

Procedure, notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a).

The first three issues presented on appeal relate to that SCRA amendment. Those issues are:

1) Whether the 2019 amendment, which does not mention arbitration, overrides the FAA's requirement that courts must enforce agreements to arbitrate claims on an individualized basis.

2) If the amendment does override the FAA, whether it applies retroactively to invalidate arbitration agreements entered into before the amendment's enactment.

3) If the amendment overrides the FAA and applies retroactively, whether it invalidates agreements to arbitrate non-SCRA claims.

The remaining two issues were raised by Plaintiffs below, but were not addressed by the district court:

4) Whether the provisions of the MLA barring arbitration agreements (10 U.S.C. §§ 987(e)(3) & (f)(4)) apply to credit card accounts opened before the effective date of the DoD regulations extending the Act's provisions to such accounts.

5)    Whether Plaintiffs' arbitration agreements are invalid because they are unconscionable or violate public policy under generally applicable state law doctrines not preempted by the FAA.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    *The Federal Arbitration Act*

Congress enacted the FAA "in 1925 in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "[I]n Congress's judgment[,] arbitration had more to offer than courts recognized—not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Epic Sys.*, 138 S. Ct. at 1621. Congress accordingly "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *Id.* (quoting 9 U.S.C. § 2).

"That is the case even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citation omitted).

Section 2 of the FAA is "the primary substantive provision of the Act." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). It states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The Supreme Court has explained that Section 2's final clause— "save upon such grounds as exist . . . for the revocation of any contract"— "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (internal quotation marks omitted).

In *Concepcion*, the Supreme Court held that, under these principles, the FAA protects agreements to arbitrate on an individual basis—in other words, arbitration agreements that bar class actions in court and in arbitration. The Court held that class-wide arbitration conflicts with "the principal advantage of arbitration—its informality—

and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." 563 U.S. at 346, 348. Put simply, class-wide arbitration "is not arbitration as envisioned by the FAA." *Id.* at 351. Applying *Concepcion* and its progeny, the Supreme Court has explained that the FAA "protect[s] pretty absolutely" arbitration agreements that require "one-on-one arbitration" using "individualized . . . procedures." *Epic Sys.*, 138 S. Ct. at 1619.

### 2.    The Servicemembers Civil Relief Act

The SCRA recognizes the importance of protecting the Nation's servicemembers, but "seeks to balance the interests of servicemembers and their creditors." Cong. Rsrch. Serv., *The Servicemembers Civil Relief Act (SCRA): Section-by-Section Summary*, R45283, at 2 (Feb. 9, 2021), https://crsreports.congress.gov/product/pdf/R/R45283/6.

One of the SCRA's provisions bars creditors from charging more than a six-percent interest rate on debts incurred before the servicemember goes on active duty. That reduced rate applies "during the period of military service." 50 U.S.C. § 3937(a)(1)(A).[1]

---

[1] The SCRA also extends the reduced rate for one year after the end of military service for any "obligation or liability consisting of a mortgage,

If a creditor violates that mandate, a servicemember may bring a claim under the SCRA. *See* 50 U.S.C. § 4042. In 2019, the SCRA's private right of action was amended to state that "[a]ny person aggrieved by a violation of" the SCRA "may in a civil action . . . be a representative party on behalf of members of a class or be a member of a class, in accordance with the Federal Rules of Civil Procedure, notwithstanding any previous agreement to the contrary." *Id.* § 4042(a).

### 3. *The Military Lending Act*

The MLA regulates commercial lending practices and products for servicemembers and their families. Its disclosure requirements and other obligations apply with respect to "exten[sions] of consumer credit" to active-duty servicemembers and their dependents. 10 U.S.C. § 987(a); *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 127 (4th Cir. 2023).

Under the MLA, creditors cannot charge an annual interest rate in excess of 36% on a covered extension of credit. 10 U.S.C. § 987(b). In addition, for "any extension of consumer credit . . . to a covered member," the creditor "shall provide to the member" multiple disclosures "orally

---

trust deed, or other security in the nature of a mortgage." 50 U.S.C. § 3937(a)(1)(A).

and in writing before the issuance of the credit": (1) "[a] statement of the annual percentage of interest applicable to the extension of credit"; (2) "[a]ny disclosures required under the Truth in Lending Act"; and (3) "[a] clear description of the payment obligations of the member." *Id.* § 987(c)(1).

The MLA also limits the use of arbitration to resolve disputes arising from covered extensions of consumer credit. It is "unlawful for any creditor to extend consumer credit to" a covered individual if "the creditor requires the borrower to submit to arbitration." 10 U.S.C. § 987(e), (e)(3). The statute also provides that "no agreement to arbitrate any dispute involving the extension of credit shall be enforceable against any" covered individual. *Id.* § 987(f)(4).

A knowing violation of the MLA is a misdemeanor punishable by up to one year of imprisonment. 10 U.S.C. § 987(f)(1). The statute also creates a private cause of action for enforcing the rights it confers. *Id.* § 987(f)(5).

Importantly, the MLA does not itself define the categories of "consumer credit" that trigger its requirements. Congress instead

directed DoD to define that term through regulations, and to promulgate other regulations to carry out the Act. 10 U.S.C. §§ 987(i)(6), 987(h).

DoD did not include credit card accounts in its initial regulations defining "consumer credit." *See* 72 Fed. Reg. 50,580 (Aug. 31, 2007).

In 2015, DoD promulgated a regulation expanding the definition to include credit card accounts; the same regulation provided that "until October 3, 2017, consumer credit does not mean credit extended in a credit card account." 32 C.F.R. § 232.13(c)(1).

The MLA's protections apply when credit is "extend[ed]" to a servicemember, and DoD recognized that businesses extending credit might have difficulty determining whether someone applying for credit is a servicemember entitled to the MLA's protections. The regulations therefore create a safe harbor: the lender will be deemed to have complied with the MLA if, when the customer establishes the account, the lender has checked certain databases to determine whether an individual is subject to the MLA's protections. 32 C.F.R. § 232.5(b)(3).

When issuing the final rule regarding credit card accounts, DoD explained that the safe-harbor provisions are designed to provide creditors with certainty. If the creditor checks the databases and an

applicant for credit is not listed as an active-duty servicemember (or dependent), then the safe harbor applies: "the safe-harbor provisions . . . allow a creditor to be free from liability under the MLA at the outset of establishing an account for credit—and throughout the lifespan of that particular account—relating to that consumer." 80 Fed. Reg. 43,560, 43,578 (July 22, 2015).

## B.  Factual Background

Citibank offers benefits to servicemembers that go above and beyond what these laws require. Those benefits include a zero-percent interest rate on both preexisting debts and purchases made while servicemembers are on active duty. Citibank also waives all fees on preexisting balances while servicemembers are on active duty. The complaint alleges that restoring the interest rates and fee schedules applicable to all of its customers once the servicemembers return to civilian life violates the SCRA.

Plaintiffs are four servicemembers who entered into credit card agreements with Citibank prior to 2017. Keith Taylor opened his account with Citibank in 2013, JA57 ¶ 20; Pablo Espin and Jeremy Bell opened their accounts with Citibank in 2014, JA53-54 ¶¶ 4-6, JA179-180 ¶¶ 4-6;

and Nicholas Padao opened his account with American Express in 2011, and Citibank acquired the account in 2016, JA55-56 ¶¶ 13-15.

When Plaintiffs opened their accounts, they each agreed to arbitrate claims against Citibank relating to their accounts or their relationship with Citibank:

- **Taylor**: When Taylor opened his account, Citibank mailed him a copy of his card agreement along with his card. JA57 ¶¶ 20-22. That agreement contained an arbitration clause. JA57 ¶¶ 20-22; *see also* JA141 (exemplar of contract). The card agreement also informed Taylor that it was binding on him unless he closed his account within 30 days of receipt and did not use or authorize use of his card. JA132.

- **Espin**: When Espin opened his account, Citibank mailed him a letter attaching the card agreement, which included an arbitration agreement. JA54 ¶ 6. The card agreement also informed Espin that it was binding on him unless Espin closed his account within 30 days of receipt and did not use or authorize use of his card. JA65. Shortly after receiving the letter, Espin began using the card. JA83.

- **Bell**: Bell opened his account in 2014 by filling out and submitting an application that came attached with the card agreement containing the arbitration provision. JA179-180 ¶¶ 4-6. Like Espin, the agreement informed Bell that it was binding unless he closed his account within 30 days and did not use or authorize use of his card. JA187. Bell also began using his credit card. JA206.

- **Padao**: Padao initially opened his credit card account with American Express, JA55 ¶¶ 13-14, but that account was transferred to Citibank in June 2016, JA55-56 ¶ 15. When it was transferred, Citibank sent Padao a letter informing him of the change and attached the new card agreement, which included the arbitration clause. JA121. Padao's agreement also provided that it would become binding once he used his card. JA115.

Each operative card agreement contains a South Dakota choice-of-law provision and a provision allowing either party to require that a dispute be resolved on an individual basis in arbitration. JA100-101, JA121-122, JA168-169, JA217-218.

The arbitration provision states, in relevant part, that arbitration must take place on "an individual basis," without "class action . . . or other representative" proceedings. JA100-101, JA121-122, JA168-169, JA217-218. The provision adds that "[i]f any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim." JA100-101, JA121-122, JA168-169, JA217-218.

The arbitration provision also makes arbitration convenient for customers. For example, arbitration is administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules, which the AAA designed to prevent unfairness to consumers. JA100-101, JA121-122, JA168-169, JA217-218; *see also* JA231-278 (AAA rules). Moreover, each Plaintiff may choose to have his arbitration hearing by telephone, videoconference, or in-person at a location close to his billing address. *See* JA100-101, JA121-122, JA168-169, JA217-218. Plaintiffs also can arbitrate their claims for free, because Citibank will pay the consumer's share of the arbitration costs for claims below $75,000. The arbitrator can award the same individualized remedies that a court can award under applicable law. And if a cardholder does not want to

arbitrate a particular claim, he or she is free to bring it in small claims court. *See* JA100-101, JA121-122, JA168-169, JA217-218.

Each Plaintiff was given the opportunity to opt out of the arbitration agreements prior to 2017. JA57-58 ¶¶ 24-25 (Taylor); JA54-55 ¶¶ 8-10 (Espin); JA180-181 ¶¶ 8-12 (Bell); JA55-56 ¶¶ 15-17 (Padao).

No Plaintiff chose to opt out of the arbitration clauses. Instead, all of the named Plaintiffs continued to use their Citibank credit cards after being notified of their opportunity to opt out of arbitration.

## C.    Proceedings Below

Plaintiffs filed this lawsuit against Citibank in 2022. Even though Citibank offered them lower interest rates than required by law, applied that lower rate to charges incurred during as well as before active duty, and waived fees on preexisting balances while on active duty, JA12-13 ¶¶ 2, 6; JA27 ¶¶ 72-73, Plaintiffs allege that it was unlawful for Citibank to provide the reduced rate and then return their credit card accounts to the civilian interest rates specified in their card agreements once their active-duty service ended. Plaintiffs also contend that Citibank's disclosures regarding the benefits and other terms relating to active-duty servicemembers are inadequate and that applicants should be permitted

to claim military status with less detailed verification. JA 25 ¶ 64; JA28 ¶¶ 80-82; JA35 ¶ 118.

Based on these theories, Plaintiffs allege federal claims under the SCRA, the MLA, the Truth in Lending Act, and the Declaratory Judgment Act. They also assert state-law claims for breach of contract, breach of the implied covenant of good faith and fair duty, breach of fiduciary duty, and for an accounting and imposition of a constructive trust. Plaintiffs seek to represent a putative nationwide class of "[a]ll persons who requested and/or received reduced interest and/or fee benefits from Citibank on an interest-bearing obligation because of an obligor's military service." JA16 ¶ 20.

Citibank strongly denies Plaintiffs' claims on the merits. In accordance with its statutory obligations, Citibank offers a lower interest rate on debts incurred *before* active duty that applies when the servicemember remains on active duty. Citibank also complies with the limitations on verification of servicemembers' eligibility, requiring servicemembers to submit their military orders in writing. And Citibank makes the requisite disclosures to all servicemembers.

In the district court, Citibank moved to dismiss for lack of personal jurisdiction as to three of the four named Plaintiffs. The district court denied the motion.[2]

The district court also denied Citibank's motion to compel arbitration. The court recognized that there is no dispute that Plaintiffs agreed to the arbitration provision. And it recognized that the SCRA "is silent as to arbitration." JA304. But the court nevertheless denied Citibank's motion to compel arbitration. The court concluded that the SCRA's 2019 amendment stating that servicemembers may, in a civil action, participate in class actions, invalidates class waivers in arbitration agreements. It also construed the arbitration provision's severability clause to "confirm[] that any class claim, which the SCRA mandates that plaintiffs may bring, cannot be arbitrated," thus (in its view) eliminating the need to consult the FAA. JA303-304.

The court also concluded that, even though Plaintiffs' arbitration agreements predated the 2019 SCRA amendment, that amendment applied retroactively and invalidated Plaintiffs' arbitration agreements.

---

[2] Citibank contends that the district court erred by denying the motion to dismiss for lack of jurisdiction.

The court then declined to address any of the parties' remaining arguments and denied Citibank's motion to compel arbitration in its entirety, even though many of Plaintiffs' claims do not arise under the SCRA.

## SUMMARY OF ARGUMENT

1.    In denying Citibank's motion to compel arbitration, the district court relied on the 2019 amendment to the SCRA, which provides that "in a civil action," a person alleging an SCRA violation may "be a representative party on behalf of members of a class or be a member of a class, in accordance with the Federal Rules of Civil Procedure." 50 U.S.C. § 4042(a). The court concluded that this provision creates an unwaivable right to class actions in court even if servicemembers have agreed to arbitrate their disputes on an individual basis.

The district court was wrong.

The Supreme Court has stated that a federal statute must expressly reference arbitration in the statutory text for a court to conclude that the law conflicts with, and overrides, the FAA's protection of arbitration agreements. When the Supreme Court has pointed to examples of statutes that override the FAA, each cited statute prohibited

arbitration in express and unequivocal terms. Section 4042(a) does not mention arbitration at all.

Section 4042(a)'s references to class actions and the Federal Rules of Procedure do not reflect a clear and manifest intent by Congress to override the FAA. Rather, they relate to actions brought in court under those Rules, and are indistinguishable from the statutory provisions that the Supreme Court found insufficient to displace the FAA in *CompuCredit.*

Moreover, there is a ready explanation for the class action language in Section 4042(a): Businesses often include in contracts—and courts sometimes enforce—class waivers that are not part of an arbitration agreement. Congress was targeting those waivers, not waivers in arbitration agreements.

The legislative context, including the evolution of the legislation containing the 2019 amendment, confirms this interpretation. The House of Representatives passed a bill containing both the provision ultimately enacted and a separate provision banning pre-dispute arbitration agreements. But Congress ultimately rejected the latter provision, instead requiring a study of arbitration in connection with the SCRA.

Even if the amendment did ban agreements for individual arbitration, the amendment does not apply here. The district court concluded that the amendment to SCRA applied retroactively to Plaintiffs' arbitration agreements, even though those agreements were formed years before the amendment's enactment. That too was error.

The Supreme Court has repeatedly recognized a strong presumption against interpreting laws to invalidate contracts retroactively. And nothing in the text of the 2019 amendment suggests that Congress intended retroactive effect. Plaintiffs rely on the amendment's reference to "previous agreements," but the context makes clear that the phrase refers to agreements pre-dating the dispute at issue, not agreements entered into before the 2019 amendment.

Even if the district court were right that the 2019 amendment applied retroactively to invalidate Plaintiffs' agreement to arbitrate SCRA claims, the court erred by invalidating the arbitration agreements with respect to Plaintiffs' non-SCRA claims. Under Supreme Court precedent, when only some claims are non-arbitrable, a court must compel arbitration of the remaining claims. And the SCRA provision on which Plaintiffs rely applies only to SCRA claims.

2.     Citibank expects Plaintiffs to argue, as they did in the district court, that the MLA prohibits arbitration of their claims. That argument—which the district court did not reach—is mistaken.

The MLA's restriction on arbitration applies to "extension[s] of consumer credit" to "covered member[s]," but credit card accounts were not included in the definition of "consumer credit" until October 2017—after each Plaintiff opened their credit card accounts with Citibank.

Plaintiffs urged the court below to hold that an "extension of consumer credit" in the credit card context is not limited to the opening of the account but also occurs with each use of the credit card. That definition is inconsistent with the statutory structure, DoD's regulations, and DoD's express statements on the subject—all of which make clear that "extension of consumer credit" occurs only at the time the credit card account is opened.

Indeed, Plaintiffs' approach would make it impossible for credit card issuers to comply with the MLA. Assume that when an account is opened, the issuer checks with the relevant DoD databases and finds that the customer is not covered by the MLA. If Plaintiffs were correct, the issuer would have to make that same assessment before approving every

single credit card transaction—because the customer could have become an active-duty servicemember or a servicemember's dependent after the account was opened. But that is not possible, because the DoD regulations bar issuers from consulting the relevant databases each time a card is swiped. And even if the databases could be used, issuers could not provide the required disclosures and otherwise comply with the MLA before approving the transaction. Accepting Plaintiffs' argument would completely disrupt the credit card industry.

3. Plaintiffs also argued below that their arbitration agreements are unenforceable on public policy and unconscionability grounds. For the reasons discussed below, those arguments are meritless.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's denial of a motion to compel arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 178 (4th Cir. 2013). "The same standard applies to questions of statutory interpretation." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 701 (4th Cir. 2018). The Court "also review[s] de novo questions of state contract law concerning the validity of the parties' arbitration agreement." *Muriithi*, 712 F.3d at 178.

## ARGUMENT

The FAA directs courts to "enforce arbitration agreements according to their terms—including terms that provide for individualized proceedings"—and bars class proceedings in both arbitration and in court. *Epic Sys.*, 138 S. Ct. at 1619; *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (FAA protects an "individualized form of arbitration").

To be sure, another federal law can override the FAA and invalidate agreements to arbitrate—including agreements for individualized arbitration—but only if there is a "clear and manifest congressional command." *Epic Sys.*, 138 S. Ct. at 1624. That "clear and manifest" command standard requires an express statement by Congress prohibiting arbitration.

The district court erred in concluding that the 2019 SCRA amendment satisfies this demanding standard—and that Congress intended it to apply retroactively. And, although the district court did not reach Plaintiffs' arguments concerning the MLA and state law, neither of those arguments warrant affirmance.

## I.    The SCRA Does Not Bar Arbitration Of Plaintiffs' Claims.

Plaintiffs' claims are subject to arbitration for four separate reasons. First, the 2019 amendment to the SCRA says nothing about arbitration, and for that reason, among others, does not override the FAA. Second, even if the amendment does prohibit arbitration of SCRA claims, it does not apply retroactively to Plaintiffs' pre-enactment arbitration agreements. Third, the district court was wrong to conclude that the severability clause in the arbitration agreement could invalidate the agreement; rather, that clause simply confirmed that class arbitration is always impermissible. Fourth, even if the 2019 amendment did apply to Plaintiffs' SCRA claims, it does not bar arbitration of Plaintiffs' non-SCRA claims.

### A.    The SCRA Does Not Displace The FAA.

The 2019 amendment to the SCRA does not come close to satisfying the high standard for overriding the FAA's command to enforce agreements for individual arbitration.

### 1.    *The SCRA's text does not override the FAA.*

To date, the Supreme Court has "rejected *every* . . . effort" to "conjure conflicts between the [FAA] and other federal statutes." *Epic*

*Sys.*, 138 S. Ct. at 1627. To create a conflict, the party must satisfy the "heavy burden" of establishing a "clear and manifest" intent by Congress to override the FAA, including the FAA's protection of individual arbitration. *Id.* at 1624. An implied conflict does not suffice; there must be a "contrary congressional command" overriding the FAA. *CompuCredit*, 565 U.S. at 98 (quotation marks omitted).

The 2019 SCRA amendment states: "[a]ny person aggrieved by a violation of [the SCRA] may *in a civil action* . . . be a representative party on behalf of members of a class or be a member of a class, *in accordance with the Federal Rules of Civil Procedure*, notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a) (emphases added).

The provision does not say a word about arbitration—much less address the enforceability of *arbitration agreements* specifying that arbitration will take place in its "traditionally individualized" form. *Epic Sys.*, 138 S. Ct. at 1623. That textual silence is dispositive: when a federal statute is "*silent on whether claims . . . can proceed in an arbitral forum,* the FAA requires [an] arbitration agreement to be enforced according to its terms." *CompuCredit*, 565 U.S. at 104 (emphasis added).

Additional authority confirms that conclusion.

*First*, the provision states that a claimant "***may in a civil action*** . . . be a representative party . . . notwithstanding any previous agreement to the contrary" (emphasis added). Congress thus made clear that its invalidation of class-action waivers applies only "in a civil action." "Civil actions" are cases in court; arbitrations are not "civil actions." *Cf.* Fed. R. Civ. P. 3 ("A *civil action* is commenced by filing a complaint with the court.") (emphasis added). By its plain language, the provision therefore applies only when a plaintiff has the right to bring an action in court—and therefore is limited to waivers not contained in arbitration agreements, because a party who has agreed to arbitration does not have the right to bring an action in court.

That limitation is further demonstrated by Congress's reference to serving as "a representative party on behalf of members of a class or be a member of a class, ***in accordance with the Federal Rules of Civil Procedure.***" (emphasis added). Those rules apply in court actions; they do not apply to arbitration. By referring to the Federal Rules, Congress again made clear that it was addressing only class waivers outside of arbitration agreements.

Businesses often include in contracts—and courts sometimes enforce—class waivers that are not part of an arbitration agreement. *See, e.g., Convergys Corp. v. NLRB,* 866 F.3d 635, 638-39 (5th Cir. 2017) (enforcing a class action waiver outside of the arbitration context); *see also In re Marriott Int'l Customer Data Sec. Breach Litig.*, 78 F.4th 677, 687 (4th Cir. 2023) (remanding case to district court to consider effect of class-litigation waivers on class certification).[3] Congress plainly was targeting those waivers, not waivers in arbitration agreements.

The Supreme Court has emphasized that courts have a "duty to interpret Congress' statutes as a harmonious whole rather than at war with one another." *Epic Sys.*, 138 S. Ct. at 1619. Holding that the 2019 amendment applies only to non-arbitration class action waivers, and not to waivers that are part of an arbitration agreement, satisfies that duty by giving effect to both the SCRA and the FAA.

*Second*, the Supreme Court's analysis of the Credit Repair Organizations Act (CROA) in *CompuCredit* fully applies here. The CROA

---

[3] *See also Benedict v. Hewlett-Packard Co.*, 2016 WL 1213985, at *3-5 (N.D. Cal. Mar. 29, 2016) (discussing and enforcing stand-alone class waiver provision); *U1it4Less v. Fedex Corp.*, 2015 WL 3916247, at *3-4 (S.D.N.Y. June 25, 2015) (same).

required credit repair organizations to notify consumers that they "have a right to sue" and included a nonwaiver provision stating that "[a]ny waiver by any consumer of any protection . . . (1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." 15 U.S.C. §§ 1679c(a), 1679f(a). In support of their effort to invalidate their arbitration agreements, the *CompuCredit* plaintiffs cited the Act's "repeated use of the terms 'action,' 'class action,' and 'court'" and its nonwaiver provision. *CompuCredit*, 565 U.S. at 100-01.

The Supreme Court rejected these arguments, first holding that the "references [to 'action,' 'class action,' and 'court,'] cannot do the heavy lifting" needed to "establish the contrary congressional command overriding the FAA." *CompuCredit*, 565 U.S. at 100-01. Nor did the Court find the nonwaiver provision sufficient, stressing that "if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a right of the consumer." *Id.* at 101.

Put simply, when a statutory cause of action referring to court proceedings says nothing about arbitration, "[i]t takes a considerable stretch to regard the nonwaiver provision as a 'congressional command'

that the FAA shall not apply." *CompuCredit*, 565 U.S. at 101-02. As the Supreme Court subsequently explained in *Epic Systems*, *CompuCredit* "refused to find a conflict even though the Credit Repair Organizations Act expressly provided a 'right to sue,' 'repeated[ly]' used the words 'action' and 'court' and 'class action,' and even declared '[a]ny waiver' of the rights it provided to be 'void.'" 138 S. Ct. at 1628 (quoting *CompuCredit*, 565 U.S. at 99-100).

The SCRA is functionally indistinguishable from the CROA, the statute at issue in *CompuCredit*. Both laws reference "a civil action" filed in court, recognize a right to bring class actions, and bar agreements waiving those rights. The only distinction is that in the SCRA those elements appear in a single provision, whereas in the CROA they were contained in separate provisions. And that distinction provides no basis for a different result: *CompuCredit*—a decision the district court never mentioned—compels the conclusion that the SCRA does not displace the FAA.

Similarly in *Robertson v. Intratek Computer, Inc.*, 976 F.3d 575 (5th Cir. 2020), the Fifth Circuit rejected the plaintiff's argument that the federal whistleblower statute, 41 U.S.C. § 4712, overrode the FAA. The

whistleblower law stated that "an action shall . . . be tried by the court with a jury," *id.* § 4712(c)(2), and included a nonwaiver provision prohibiting "waive[r] by any agreement, policy, form, or condition of employment," *id.* § 4712(c)(7). The Fifth Circuit held that the statute did not override the FAA, noting the "Supreme Court's dogged insistence" in cases like *CompuCredit* "that Congress speak with great clarity when overriding the FAA." *Robertson*, 976 F.3d at 582; *see also id.* (citing *Epic Sys.*, 138 S. Ct. at 1626).

The Supreme Court's decision in *Concepcion* confirms why *Robertson* is correct—and applies with equal force here. In *Concepcion*, the Court stated that substituting an arbitrator for a jury was one of arbitration's core benefits that the FAA protects because it gives parties "the ability to choose expert adjudicators to resolve specialized disputes." *Concepcion*, 563 U.S. at 348 (internal quotation marks omitted); *id.* at 349 n.7. As *Robertson* explained, Congress's inclusion in the whistleblower statute of an anti-waiver provision generally protecting trial by jury was not sufficient to override an arbitration agreement; instead, "great[er] clarity" regarding arbitration was required. 976 F.3d at 582.

The Supreme Court similarly has explained that requiring class relief—like requiring a jury—would constitute a "fundamental" change that eliminates the benefits of arbitration. *Concepcion*, 563 U.S. at 347-48. That is why the Court has declared that the FAA "protect[s] pretty absolutely" arbitration agreements that require "one-on-one arbitration" using "individualized . . . procedures"—that is, the FAA "protect[s]" the parties' "intention to use individualized rather than class or collective action procedures." *Epic Sys.*, 138 S. Ct. at 1619, 1621.

Section 4042(a)'s prohibition of contracts waiving class procedures, therefore, is just like the whistleblower statute's bar on jury trial waivers. Like jury trials, class proceedings interfere with a fundamental element of arbitration protected by the FAA. For that reason, Congress's decision in the SCRA amendment not to refer to arbitration expressly requires courts to harmonize that amendment with the FAA and—under the principles in *Robertson* (applying *CompuCredit* and *Epic Systems*)—hold that the SCRA's bar on class-action waivers does not apply to waivers contained in arbitration agreements.

*Third*, when Congress intends to abrogate the FAA, it does so clearly—as the Ending Forced Arbitration of Sexual Assault and Sexual

Harassment Act of 2021 demonstrates. That law bars enforcing certain "pre-dispute joint action waiver[s]"—which it defines to include "an agreement, *whether or not part of a predispute arbitration agreement*, that would prohibit, or waive the right of, one of the parties to the agreement to participate in a joint, class, or collective action in a judicial, arbitral, administrative, or other forum, concerning a dispute that has not yet arisen at the time of the making of the agreement." 9 U.S.C. § 401(2) (emphasis added).

This 2021 law stands in stark contrast to the 2019 SCRA amendment: the 2021 act expressly refers to arbitration agreements and makes clear that the nonwaiver provision applied to them. The SCRA amendment makes no mention of arbitration, instead referring to "civil action[s]" and class actions in accordance with the Federal Rules of Civil Procedure, 50 U.S.C. § 4042(a)—falling far short of the "contrary congressional command" required to override the FAA.

For all of these reasons, the SCRA does not invalidate the arbitration agreements at issue here.

## 2. The SCRA's statutory context confirms that Congress did not intend to displace the FAA.

The evolution of the bill that enacted the 2019 amendment—the National Defense Authorization Act for Fiscal Year 2020—confirms that the amendment does not override the FAA.

The House-passed bill included not only the language eventually enacted in Section 4042(a) but also a separate provision that would have expressly barred enforcement of pre-dispute arbitration provisions with respect to SCRA claims. The proposed provision stated: "whenever a contract with a servicemember . . . provides for the use of arbitration to resolve a controversy subject to a provision of this Act . . . , arbitration may be used to settle such controversy only if, after such controversy arises, all parties to such controversy consent in writing to use arbitration." *National Defense Authorization Act for Fiscal Year 2020,* S. Bill 1790 at § 550H (116th Cong.) (Sept. 17, 2019), https://www.congress.gov/116/bills/s1790/BILLS-116s1790eah.pdf.

The House bill's inclusion of both this anti-arbitration provision (which did not become law) and the class-waiver language ultimately enacted confirms that the law as enacted limits only class-litigation waivers outside the arbitration context. Had the House intended for

36

Section 4042(a) to invalidate class waivers in arbitration agreements, it would not have proposed language that elsewhere eliminates all arbitration agreements for SCRA claims.

Ultimately, when Congress enacted the bill, it omitted the House's proposal to invalidate arbitration agreements. *See National Defense Authorization Act for Fiscal Year 2020,* Pub. L. No. 116-92, 133 Stat. 1198 (Dec. 20, 2019). Congress instead provided for a *study* of the arbitration of SCRA and related claims. Section 550F of the law directs the Comptroller General to conduct a review and submit a report to Congress regarding "the effects of the common commercial and governmental practices of including a mandatory arbitration clause in employment and consumer agreements, on the ability of servicemembers to assert claims under and secure redress for violations of," among other laws, the SCRA. *National Defense Authorization Act for Fiscal Year 2020*, Pub. L. No. 116-92, 133 Stat. 1384 § 550F(b)(1)(C).

The report that was eventually submitted to Congress discussed the effect of class waivers in arbitration agreements. *See* U.S. Gov't Accountability Office, *Servicemember Rights: Mandatory Arbitration Clauses Have Affected Some Employment and Consumer Claims but the*

*Extent of Their Effects is Unknown* 9-11 (Feb. 2021), https://www. gao.gov/assets/gao-21-221.pdf. That aspect of the report would have been unnecessary, of course, if the 2019 amendment did invalidate class waivers in arbitration agreements.

Congress made a deliberate choice when it omitted the language invalidating pre-dispute arbitration provisions. As the conference report explains, the study was added to resolve the conflict between the House bill (which barred enforcement of arbitration agreements and separately addressed class actions "in a civil action") and the Senate bill (which contained neither provision). *National Defense Authorization Act for Fiscal Year 2020, Conference Report to Accompany S. 1790*, S. Rep. No. 116-333, at 1229 (Dec. 9, 2019) (stating the "Senate receded" from the conflict with the House bill by agreeing to the amendment calling for a study).

The evolution of Section 4042(a)'s statutory text thus confirms that Congress opted not to address arbitration agreements at all and instead to commission a study of the impact of arbitration agreements in this context.

Indeed, the very same pattern recurred the following year. The House adopted language expressly limiting the use of arbitration, *National Defense Authorization Act for Fiscal Year 2022,* H.R. Rep. 4350, at § 6414 (117th Cong.) (Oct. 18, 2021) (available at https://www.congress.gov/117/bills/hr4350/BILLS-117hr4350pcs.pdf), but that language was omitted from the final bill. And, of course, the fact that the House again proposed (unsuccessfully) a ban on arbitration in 2021 demonstrates that Congress itself did not believe that its prior enactment affected arbitration of SCRA claims.

### 3. *The district court erred by invoking* Lyons.

The district court cited this Court's decision in *Lyons v. PNC Bank*, 26 F.4th 180 (4th Cir. 2022). JA305. But *Lyons* provides no support for interpreting the SCRA amendment to invalidate class waivers in arbitration agreements.

The question in *Lyons* was whether a provision of the Truth in Lending Act (TILA) precluded arbitration of the plaintiff's claims. The statute stated that "[n]o provision" of certain types of loan agreements "shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other

court of competent jurisdiction" alleging a violation of federal law. 15 U.S.C. § 1639c(e)(3). This Court held that the provision barred enforcement of an arbitration agreement with respect to such claims.

Unlike the present case, the TILA provision at issue expressly referred to arbitration in multiple ways:

- The provision was contained in a subsection entitled "Arbitration."

- It was the last paragraph in the three-paragraph subsection; and the first two paragraphs expressly addressed arbitration. The first stated that "no extension of credit . . . may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). The second stated that "[s]ubject to paragraph (3), paragraph 1" should not be interpreted to prohibit arbitration agreements entered into after a controversy had arisen. *Id.* § 1639c(e)(2).

- Paragraph (2)'s cross-reference to paragraph (3)—the provision at issue in *Lyons*—linked the prior references to arbitration to paragraph (3)'s invalidation of provisions in certain types of agreements "bar[ring] a consumer from bringing an action in" an appropriate court.

This Court relied on those express references to arbitration in holding that the FAA was superseded. 26 F.4th at 187 ("[T]he provision is found in a short section of the Act entitled 'Arbitration.'"); *id.* (the position of the party seeking arbitration "is difficult to reconcile with the structure of Dodd-Frank").

This Court also found support in the legislative history, where "Congress described § 1639c(e) as 'prohibit[ing] mandatory arbitration clauses.'" *Lyons*, 26 F.4th at 187 (quoting H.R. Rep. No. 111-517, at 877 (2010)). And this Court found support in the implementing regulations, which permitted only post-dispute arbitration agreements. These regulations, this Court reasoned, "would be unwarranted unless § 1639c(e)(3) prohibits pre-dispute agreements to resolve claims in a non-judicial forum." *Id.* at 188.

Here, there is no textual reference to arbitration whatsoever. The legislative history of the provision similarly says nothing about arbitration. And the evolution of the statutory text as the bill moved through the legislative process confirms that there was no intent to address arbitration.

In short, the reasoning in *Lyons* confirms that the SCRA provision does not invalidate class waivers in arbitration agreements.

**B.    The 2019 Amendment Does Not Apply Retroactively To Invalidate Arbitration Agreements Entered Into Before Its Enactment.**

Even if the 2019 amendment to the SCRA bars enforcement of class waivers in arbitration agreements, which it does not, that amendment does not apply retroactively to invalidate agreements, like Plaintiffs', formed prior to the amendment's enactment.

The district court concluded that "the SCRA class action protections . . . may be applied retroactively," JA304, because the court believed that the amendment did not alter Citibank's substantive rights. That analysis is incorrect.

Retroactivity is "not favored in the law." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988). "The largest category of cases in which [the Supreme Court has] applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994).

That presumption applies here. The right to enforce an arbitration agreement is a substantive contractual right that is recognized and protected by the FAA. As the Supreme Court explained in *Concepcion*, Section 2 of the FAA is the "primary ***substantive*** provision of the Act"— directing courts to "place arbitration agreements on an equal footing with other contracts" and "enforce them according to their terms." 563 U.S. at 339 (emphasis added); *see also Perry v. Thomas*, 482 U.S. 483, 489 (1987) (Section 2 "create[s] a body of federal *substantive* law of arbitrability") (emphasis added); *cf. Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 272 (1995) (refusing to overturn FAA precedent because "private parties have likely written contracts relying upon [it] as authority").

In other contexts, courts have applied this presumption to hold that statutory prohibitions on arbitration agreements do not apply retroactively to pre-existing contracts. For example, multiple district courts have considered the Dodd-Frank Act's express prohibitions on arbitration and refused to apply them retroactively. As one district court concluded, such a prohibition "affects the parties' substantive contractual right to arbitrate the claims against them, a right that Congress has

recognized as 'irrevocable.'" *Beckwith v. Caliber Home Loans,* 2015 WL 3767187, at *6 (N.D. Ala. June 17, 2015) (quoting 9 U.S.C. § 2); *see also*, *e.g.*, *Weller v. HSBC Mortg. Servs.*, 971 F. Supp. 2d 1072, 1079 (D. Colo. 2013); *Davies v. Green Tree Servicing*, 2015 WL 3795621, at *4 (M.D. Penn. June 18, 2015); *Blackwell v. Bank of Am. Corp.*, 2012 WL 1229675, at *1 (D.S.C. Apr. 12, 2012), *adopting* 2012 WL 1229673 (D.S.C. Mar. 22, 2012); *Henderson v. Masco Framing Corp.*, 2011 WL 3022535, at *4 (D. Nev. July 22, 2011).

The district court here suggested that the SCRA amendment "may be applied retroactively" by comparing the amendment to "a jurisdiction-conferring or jurisdiction-stripping statute" that "usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" JA304 (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 576-77 (2006)). But, as the cases just discussed make clear, the Supreme Court has explained that the right to compel arbitration under the FAA is a *substantive* right. *See also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) ("Nor does congressional approval of Rule 23 establish an entitlement to class proceedings . . . . [I]t is likely that such an entitlement, invalidating private arbitration agreements denying

class adjudication, would be an 'abridg[ment]' or 'modif[ication]' of a '*substantive right*' . . . .") (emphasis added).

To overcome the presumption against retroactivity, the Supreme Court requires a showing that Congress "clear[ly] inten[ded]" to apply the new rule to pre-existing contracts. *Landgraf*, 511 U.S. at 272. That high standard "assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id*. at 272-73.

Again, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 is instructive. There, Congress made clear its intent that the statute should apply to all claims arising after the statute's enactment, regardless of whether an arbitration agreement had previously been formed. It specified in the statutory text that "[t]his Act, and the amendments made by this Act, shall apply with respect to ***any dispute or claim*** that ***arises or accrues*** on or after the date of enactment of this Act." Pub. L. No. 117-90, 136 Stat. 26, 28 (2022) (emphasis added). That provision leaves no doubt that the statute applies retroactively to *all* arbitration agreements—not just those entered into

after the Act's passage—provided the claim "arises or accrues" after the Act became law.

Here, there is no congressional statement that comes close to satisfying the "clear intent" standard.

To be sure, Section 4042(a) states that parties may file class actions in court "notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a). "[P]revious agreement[s]" in this provision plainly means pre-dispute agreements—contracts formed before the parties' dispute arose. If that phrase meant "agreements entered into before enactment," it would drastically limit Section 4042(a)'s scope: any agreement waiving class actions entered into after the date of enactment would not be invalidated. Nor can the word "previous" carry both meanings; to do that, Congress would have had to include two separate clauses addressing both pre-dispute agreements and pre-enactment agreements.

Plaintiffs relied below on *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 637 F.3d 454 (4th Cir. 2011), but that decision is wholly inapposite. This Court in *Gordon* held that Section 802(a) of the SCRA, 50 U.S.C. app. § 597a, which had been enacted while the case was on appeal, gave

the plaintiff a new federal cause of action. 637 F.3d at 457-58. The Court was not troubled by allowing the new cause of action to proceed because it merely codified rights that the plaintiffs already had under state law. *Id.* at 458-59. The amendment at issue in *Gordon* thus did not affect any party's contractual rights; instead, it simply provided a federal cause of action for acts already deemed unlawful.

Here, by contrast, Plaintiffs are asking to invalidate the parties' agreement and deprive Citibank of its substantive contractual right to arbitrate based on a law that did not exist at the time the parties agreed to arbitration. That retroactive effect is impermissible when (as here) Congress has not expressly declared the statute to have retroactive effect.

## C. The District Court Erred In Relying On The Arbitration Agreement's Severability Clause To Deny Arbitration.

The district court also appeared to conclude that, even if the SCRA amendment did not bar arbitration of the SCRA claim, arbitration was precluded by operation of the arbitration agreement itself. JA303. But the arbitration agreement cannot, and should not, be construed to be self-defeating.

The district court observed that Citibank's arbitration provision contained a severability provision confirming that class arbitration is always impermissible: "If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, *except that there can be no arbitration of a class or representative Claim*." JA303 (quoting JA89-90) (emphasis added by district court). According to the district court, because "Citibank's own arbitration agreement confirms that any class claim . . . cannot be arbitrated," and "the SCRA mandates that plaintiffs may bring" class claims, the court "need not consult the FAA." JA303-304.

That conclusion puts the cart before the horse. The arbitration agreement requires that arbitration take place on "an individual basis" and states: "Claims brought as part of a class action, . . . or other representative action can be arbitrated only on an individual basis." *See* JA100, JA121, JA168, JA217. If the agreement is enforceable, therefore, Plaintiffs cannot bring a class action in court or in arbitration. There would be no holding of invalidity to trigger the severability clause or its prohibition on a class proceeding in arbitration. The arbitration

agreement would remain in effect and by its terms would preclude any such proceeding.

The district court appeared to construe the arbitration clause to prohibit only class proceedings in arbitration and not to preclude class actions in court. That precise argument has been rejected by the Ninth and Eleventh Circuits.

In *Cruz v. Cingular Wireless*, the plaintiffs argued that "*Concepcion* was only concerned with state laws that impose . . . class *arbitration* on parties," and "[b]ecause [the company's] blowup provision ensures that [the company] will not be forced into class *arbitration*—but only class *litigation*—they claim that *Concepcion* is not implicated here." 648 F.3d 1205, 1213 (11th Cir. 2011). But the Eleventh Circuit squarely rejected that argument, concluding that the point of the holding in *Concepcion* is that "class procedures are inconsistent with the FAA"; it was "not to argue for increased class action litigation." *Id.* at 1214.

Relying on *Cruz*, the Ninth Circuit agreed, explaining that "[t]he Eleventh Circuit also easily rejected the same argument that Plaintiffs now make . . . to distinguish *Concepcion*—[state] law would enforce the 'blow-up' provision to invalidate the entire arbitration agreement"; "by

invalidating arbitration agreements for lacking class-action provisions, a court would be doing precisely what the FAA and *Concepcion* prohibit." *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1160 (9th Cir. 2012). As *Cruz* and *Coneff* underscore, the FAA does not allow a court to use a severability clause that prohibits class arbitration to "invalidate the entire arbitration agreement" (*id.*) in favor of class litigation in court.

Because, for the reasons discussed, the arbitration agreement remains valid—including its prohibition of class proceedings—Plaintiffs are barred from bringing a class proceeding in either forum. Only if the Court were to conclude, contrary to our submission, that the SCRA amendment overrides the FAA and invalidates class waivers in arbitration agreements, would the severability clause require that any class action be brought in court and not in arbitration.

### D. The SCRA Does Not Bar Arbitration Of Plaintiffs' Non-SCRA Claims.

Finally, even if the SCRA applies to arbitration agreements, and even if the 2019 amendment is retroactive and therefore applies to Plaintiffs' SCRA claims, the district court erred in refusing to compel arbitration of Plaintiffs' non-SCRA claims.

The FAA "require[s] that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011). "[T]he fact that the matters to be arbitrated may be 'intertwined factually and legally' with the matters to be decided by the district court no longer presents an obstacle to arbitration of the arbitrable matters." *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1460 (4th Cir. 1992). That is true "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *see also KPMG*, 565 U.S. at 19.

Here, Plaintiffs assert multiple federal and state claims, most of which do not arise under the SCRA and are therefore arbitrable even if the 2019 SCRA amendment bars arbitration of their SCRA claims. The district court did not address these claims, instead opting to deny Citibank's motion to compel arbitration in its entirely. That holding— resting solely on the perceived non-arbitrability of SCRA claims—flatly violates Supreme Court precedent.

## II.    The MLA Does Not Bar Arbitration Of Plaintiffs' Claims.

Plaintiffs argued below that the MLA separately prohibits enforcement of their arbitration agreements. We expect Plaintiffs to assert that argument on appeal as an alternative basis for affirmance. But that argument rests on a misreading of the MLA and its implementing regulations.

The MLA makes it "unlawful for any creditor *to extend consumer credit* to a covered member . . . with respect to which . . . the creditor requires the borrower to submit to arbitration." 10 U.S.C. § 987(e)(3) (emphasis added). The MLA also provides that "no agreement to arbitrate any dispute *involving the extension of consumer credit* shall be enforceable against any covered member . . . or any person who was a covered member . . . when the agreement was made." § 987(f)(4) (emphasis added).

The MLA's arbitration prohibitions thus apply only when there is an "extension of consumer credit." The MLA does not define "consumer credit"; instead, Congress delegated that task to DoD. 10 U.S.C. § 987(h).

In 2015, DoD for the first time added credit card accounts to its definition of "consumer credit," but it established October 3, 2017, as the

effective date of the regulation expanding the definition. *See* 32 C.F.R. § 232.13(c)(1). As the Department explained, "consumer credit should not include credit extended in a credit card account . . . until October 3, 2017." 80 Fed. Reg. at 43,561.

Here, each Plaintiff opened his credit card account with Citibank before October 3, 2017. The MLA thus does not apply to the arbitration agreements Plaintiffs accepted when they opened their accounts.

Plaintiffs have advanced two arguments to support their contention that the MLA invalidates their arbitration agreements. First, Plaintiffs contend that an "extension of consumer credit" occurs not just when a credit card account is opened but also each time the card is used. Second, Plaintiffs assert that the regulation's definition of "covered borrower" allows them to avoid arbitration of their claims. Plaintiffs are wrong on both counts.

## A. In The Credit Card Context, An "Extension Of Consumer Credit" Occurs Only Upon The Opening Of The Credit Card Account.

Plaintiffs' contention that a new "extension of consumer credit" occurred *each time* they used their credit cards, not just when they opened their accounts, is squarely rejected in DoD's implementing

regulations. If accepted, moreover, that interpretation would make it impossible for credit card issuers to comply with the MLA.

1. *The MLA regulations make clear that an "extension of consumer credit" does not occur with each use of a credit card.*

Multiple elements of the DoD regulations leave no doubt that an "extension of consumer credit" occurs only when a credit card account is opened and not each time a consumer uses the card.

To begin with, that conclusion necessarily underlies DoD's decision to delay the effective date of its 2015 revision of the definition of "consumer credit" until October 3, 2017. The inclusion of an effective date otherwise would make no sense, because virtually every credit card account held by an active servicemember on October 2, 2017, would become subject to the MLA the moment the customer swiped her credit card after the effective date. Plaintiffs' interpretation would render the decision to delay the effective date virtually meaningless because the MLA would quickly apply to every servicemember account in existence before the effective date.

Next, the regulation's safe-harbor provision makes sense only if the extension of credit occurs only when the credit card account is opened.

That provision states that, if card issuers such as Citibank check certain databases to determine whether an individual is in fact a "covered borrower"—a servicemember or related person—and therefore subject to the MLA's requirements, they may rely on the information provided by the databases to make their MLA determination. 32 C.F.R. § 232.5(b)(3).

This database check is "deemed to be conclusive with respect to that transaction or account" as long as the creditor makes a documented check of the databases up to 30 days before *either* the "consumer initiates the transaction" "*or*" the "consumer applies to establish the account." 32 C.F.R. § 232.5(b)(3) (emphasis added). The database check is a "*one-time* determination" *Id.* (emphasis added). Creditors are prohibited from accessing these databases "[a]t any time after a consumer has . . . established an account involving an extension of credit." *Id.* § 232.5(b)(2)(i)(B).

As the final rule explains, "the safe-harbor provisions . . . were designed to allow a creditor to be free from liability under the MLA at the outset of establishing an account for credit—and throughout the lifespan of that particular account—relating to that consumer." 80 Fed. Reg. at 43,578 (internal quotation marks omitted). In other words, DoD wanted

to ensure that creditors could check a borrower's eligibility for MLA protections only once—before the "extension of consumer credit."

If the Court adopted Plaintiffs' interpretation, this safe-harbor provision would place creditors in an impossible position. Creditors would be forced to perform the database search every single time a consumer uses the credit card because the "safe harbor" would vanish when a new extension of credit occurred. Not only is that approach unworkable, but it also contravenes the safe-harbor regulation, which allows creditors to perform the database check only once. *See* 32 C.F.R. § 232.5(b)(3); *id.* § 232.5(b)(2)(i)(B).

Moreover, if the database search were required in connection with each use of the credit card—and a search revealed that a customer had switched into active-duty military status, creditors would be forced to comply with a number of other obligations before processing the transaction. The creditor would have to provide orally and in writing the detailed disclosures required by 10 U.S.C. § 987(c)(1). *See* p. 12, *supra*. The creditor also would have to adjust the annual rate permitted by the MLA. *See* 10 U.S.C. § 987(b). And the creditor would have to update the

customer's agreement to remove terms forbidden by the MLA. *Id.* § 987(e).

Failure to perform these steps, or failure to perform the database check at all on a customer who is now covered by the statute (and which would need to occur at the time the transaction occurred), would subject creditors to the risk of criminal penalties. 10 U.S.C. § 987(f)(1).

That is why the only reasonable reading of the MLA is that the "one-time determination" takes place in connection with the initial opening of a credit card account.

> 2.  *The Department of Defense's statements in connection with issuance of the 2015 regulation confirm that the "extension of consumer credit" occurs only when the account is opened.*

DoD's statements when it expanded the statute's reach to cover credit cards further confirm the proper meaning of "extension of consumer credit."

The Department stressed that the MLA "should not be interpreted so as to impose restrictions on an existing agreement between a creditor and a consumer involving a credit transaction . . . that spring to life when the consumer becomes a covered borrower when he or she begins active duty service in the military." 80 Fed. Reg. at 43,579 n.168. In other words,

it is the opening of the account that is the critical moment for determining MLA status.

DoD explained that the revised definition would be "fair to the creditor" only if the creditor could determine at the account-opening stage whether the MLA applies, because that is when creditors are "in a position to know" whether the borrower is an active military member. 79 Fed. Reg. 58,602, 58,616 (Sept. 29, 2014). That was consistent with the Department's "longstanding policy . . . that a creditor is not required to constantly monitor the status of each consumer who has obtained credit or holds an account for credit to assess whether the consumer is a 'covered borrower.'" *Id.* Instead, creditors could "conduct that assessment . . . only at the outset of the transaction or when establishing the account for consumer credit." *Id.*

DoD further confirmed that, for credit card accounts, the account opening constitutes the sole "extension of credit" through its response to a request from credit-card issuers. Issuers had asked for clarification on the application of the safe-harbor provision to increases in the credit limit on a credit card account. DoD stated: "an action by a creditor within an existing account, such as to increase the available credit that a consumer

may draw upon in an account, does not alter the status of the creditor's prior determination for that account." 80 Fed. Reg. at 43,578-79.

The "prior determination" that DoD referenced is the determination, pursuant to the safe-harbor process, whether the customer is covered by the MLA. Indeed, the next sentence stated that "[t]he Department has adopted a new provision, in § 232.5(b)(3), to clarify this aspect of the operation of the safe harbor." 80 Fed. Reg. at 43,579. The provision cited is the one—entitled in part "one-time determination permitted"—stating that the determination of MLA status at the time of an account opening is "conclusive." *Id.* (citing 32 C.F.R. § 232.5(b)(3)); *see* pp. 54-56, *supra* (discussing Section 232.5(b)(3)).

DoD thus made clear that an increase in a line of credit does not constitute a new "extension of credit" requiring a new check to determine whether the customer is covered by the MLA. And if an increase in the credit available to a customer does not constitute a new "extension of credit" then surely the use of a credit card, which merely draws upon the credit extended when the account was opened, does not qualify.

Finally, when DoD first proposed including credit cards within the MLA's coverage, DoD acknowledged that retroactive application of the

MLA to existing agreements would be unfair. DoD explained that "§ 987(f)(3) would operate unjustly if a consumer, upon obtaining the status of a covered borrower, could sue the creditor to void an existing credit contract on the grounds that the contract—which may have been entirely lawful when originally entered into with the consumer—violates one or more provisions of 10 U.S.C. § 987." 79 Fed. Reg. at 58,616.

That is precisely what would happen if Plaintiffs' proposed interpretation of the MLA were adopted. A non-servicemember customer could open a credit card account tomorrow. The creditor would—as explained above—perform a one-time database check to confirm that the customer is in fact not subject to the MLA. But if the customer were to become a servicemember weeks, months, or years in the future, then she would (on Plaintiffs' view) instantly become covered by the MLA when she next used her credit card, thereby triggering a variety of MLA requirements and prohibitions. That unstable and unpredictable regime runs directly contrary to DoD's efforts to ensure a workable regulatory scheme for creditors.

3.    American Express Co. v. Koerner *provides no support for Plaintiffs' position.*

Plaintiffs argued in the district court that their interpretation of the MLA was supported by TILA's use of the phrase of "extension of credit." That argument is meritless.

Like the MLA, TILA itself does not define "extension of credit." Plaintiffs relied on dicta in *American Express Co. v. Koerner*, 452 U.S. 233 (1981). There, the Supreme Court stated that "extension of consumer credit" could mean either "only the creation or renewal of the account" or could involve a "transaction-by-transaction approach"—and expressly refused to endorse either definition. *Id.* at 242. In other words, the Court acknowledged that the phrase in TILA was open to interpretation, but determined that it did not need to address any ambiguity given the facts of the case in *Koerner*. *Id.* at 242-43. *Koerner* therefore provides no support for Plaintiffs' argument.

\*    \*    \*    \*

In sum, the DoD's regulations and DoD's statements concerning the MLA confirm that "extension of consumer credit" applies only to the opening of a credit card and not to each use of that card. Because Plaintiffs do not dispute that they opened their accounts with Citibank

before the effective date, their post-effective date use of the cards does not trigger the MLA's protections.

## B.    The MLA's Reference to "Covered" Borrowers Is Irrelevant.

Plaintiffs argued below that the MLA regulation's reference to "covered" borrowers supports their position that the MLA invalidates their arbitration agreements.[4] Plaintiffs are mistaken.

To begin with, the MLA's limitations on arbitration apply only in connection with "extension[s] of consumer credit." Thus, Section 987(e)(3) states that a creditor cannot "extend consumer credit to a covered" borrower if "the creditor requires the borrower to submit to arbitration." Section 987(f)(4) declares unenforceable agreements to arbitrate disputes "involving the extension of consumer credit . . . against any covered" borrower.

Under either provision, therefore, an arbitration agreement is prohibited only if there has been an "extension of consumer credit" to a "covered borrower." *See also* 32 C.F.R. § 232.8 ("Title 10 U.S.C. § 987

---

[4] The MLA defines "covered member[s]," 10 U.S.C. § 987(i)(1), but DoD created the definition of "covered borrower" to include servicemembers' dependents as well as servicemembers—because dependents also are protected by the MLA.

makes it unlawful for any creditor **to extend consumer credit** to a covered borrower." (emphasis added)); *id.* § 232.9(d) ("[N]o agreement to arbitrate any dispute involving **the extension of consumer credit** to a covered borrower . . . shall be enforceable." (emphasis added)).

As just explained, no extension of credit within the meaning of the MLA occurred here because Plaintiffs opened their accounts before the MLA was expanded to cover credit card accounts. That requires rejection of Plaintiffs' argument.

In addition, DoD's definition of "covered borrower" independently forecloses Plaintiffs' interpretation because Plaintiffs were not covered borrowers when they opened their accounts. The regulations define "covered borrower" to "mean[] a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit" was an active-duty or active-reserve military member or their dependent. 32 C.F.R. § 232.3(g)(1).

Prior to 2017, the regulation defined covered borrower to mean only the customer who "becomes obligated on a consumer credit transaction." DoD added the second clause—"establish[ing] an account for consumer credit"—when it expanded the definition of "consumer credit" to include

credit card accounts. DoD explained that "[c]onsumers typically do not become 'obligated' on credit cards . . . until the first transaction or a certain period after delivery of the card," and that the expanded definition was intended to cover credit card accounts, and allow "a creditor to conduct only one covered-borrower check within the permitted safe harbor at an early stage of the transaction or the relationship with the consumer." 80 Fed. Reg. at 43,578, 43,586.

In other words, Plaintiffs cannot rely on the language contained in the prior definition to trigger the MLA when the new language—"establish an account for consumer credit"—was the language added to address credit cards. Because Plaintiffs opened their accounts with Citibank before the MLA applied to credit card accounts, they are not covered borrowers for this independent reason as well.

## III.  The Arbitration Agreements Are Valid Under State Law.

Plaintiffs also argued below that the arbitration agreements violate public policy and are unconscionable under state law. Plaintiffs are wrong.

## A. The Agreements Do Not Violate Public Policy.

Plaintiffs asserted that their arbitration agreements violate both state and federal public policy. Both contentions are incorrect.

With respect to the argument based on state law, the agreements specify that they are governed by South Dakota law, Plaintiffs therefore must identify a South Dakota public policy that invalidates the agreements.

But Plaintiffs cited no South Dakota decision or public policy to support their assertion that the arbitration agreements violate South Dakota's public policy. To the contrary, South Dakota has "an overriding policy *favoring* arbitration[.]" *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 814 (S.D. 2002) (emphasis added); *see also*, *e.g.*, *Snow v. Citibank, N.A.*, 2015 WL 799543, at *8 (E.D.N.C. Feb. 25, 2015) (rejecting argument that Citibank's arbitration provision is "against public policy").

Moreover, a state policy opposing arbitration would violate the FAA, which bars states from "singl[ing] out arbitration agreements for disfavored treatment," whether overtly or "covertly." *Kindred Nursing Ctrs. Ltd P'ship v. Clark*, 581 U.S. 246, 248, 251 (2017); *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) ("[A] categorical rule

prohibiting arbitration of a particular type of claim . . . is contrary to the terms and coverage of the FAA.").

Nor does any federal public policy invalidate Plaintiffs' arbitration agreements. Below, Plaintiffs suggested that enforcing the agreements undermines a policy promoting "military readiness" because it would inhibit enforcement of soldiers' statutory rights. But that is the exact sort of "suspicion of arbitration as a method of weakening [statutory] protections" that the Supreme Court said over 30 years ago is "far out of step with our current strong endorsement" of arbitration. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989).

In any event, to invalidate a contract, federal "public policy must be explicit, well defined," and "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *E. Assoc. Coal Co. v. United Mine Workers of Am.*, 531 U.S. 57, 62 (2000) (internal quotation marks omitted). Here, the FAA "establishes" that the relevant "federal policy" instead "requires courts to enforce agreements to arbitrate according to their terms"—a "mandate" that can be "overridden" only "by a contrary congressional command."

*CompuCredit*, 565 U.S. at 98 (internal quotation marks omitted). For the reasons explained in Part I, Congress has issued no such command here.

In the absence of any state or federal public policy disfavoring the arbitration agreements—to the contrary, the applicable state and federal policies favor arbitration—Plaintiffs cannot invalidate the arbitration agreements on public-policy grounds.

**B.      The Agreements Are Not Unconscionable.**

Plaintiffs also argued below that the arbitration agreements are unconscionable under South Dakota law. That assertion requires Plaintiffs to demonstrate that the agreements are both procedurally and substantively unconscionable. *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 194-95 (S.D. 2007). Plaintiffs cannot make either showing—much less both.

To be substantively unconscionable, a contract term must be "overly harsh or one-sided," *Nygaard*, 731 N.W.2d at 195. Nothing in the arbitration clause comes close to meeting this requirement. Plaintiffs appeared to suggest that the clause is substantively unconscionable because it requires individualized arbitration. Pls.' Opp. to Mot. to Compel Arbitration and Stay Action 26, ECF No. 27 (Feb. 16, 2023). But

district courts applying South Dakota law have concluded that the class-waiver provision in Citibank's arbitration clause is not unconscionable. *E.g.*, *Dumanis v. Citibank (S. Dakota), N.A.*, 2007 WL 3253975, at *3 (W.D.N.Y. Nov. 2, 2007).

Moreover, as the Supreme Court has explained, even if South Dakota law did deem individual arbitration unconscionable (it does not), the FAA would preempt that state-law rule. *Concepcion*, 563 U.S. at 352; *see also Epic Sys.*, 138 S. Ct. at 1621 ("[T]he Arbitration Act seems to protect pretty absolutely" parties' "intention to use individualized rather than class or collective action procedures.").

Plaintiffs also suggested that the American Arbitration Association's Consumer Arbitration Rules are substantively unconscionable. But courts have repeatedly rejected such attacks. *See*, *e.g.*, *Larsen v. Citibank FSB*, 871 F.3d 1295, 1317 (11th Cir. 2017) (rejecting challenge to AAA consumer rules); *Samenow v. Citicorp Credit Servs., Inc.*, 253 F. Supp. 3d 197, 208 (D.D.C. 2017) ("the AAA rules" are "neutral and fair").

In short, neither of the substantive unconscionability arguments Plaintiffs made below has any support in South Dakota law. That alone ends the unconscionability inquiry.

Even if Plaintiffs could somehow show that the agreements are substantively unconscionable, they failed to show that the agreements are procedurally unconscionable. Each Plaintiff had a clearly disclosed opportunity to opt out of arbitration. None chose to opt out. That alone is sufficient to defeat any argument that the arbitration agreements were procedurally unconscionable. *See, e.g.*, *Dumanis*, 2007 WL 3253975, at *3 ("[T]he arbitration clause is not procedurally unconscionable, since it was adopted in accordance with . . . South Dakota law, and Plaintiff had the opportunity to opt-out of the arbitration clause." (footnote omitted)); *Schwalm v. TCF National Bank*, 226 F. Supp. 3d 937, 943 (D.S.D. 2016) (same); *Coppok v. Citigroup, Inc.*, 2013 WL 1192632, at *9 (W.D. Wash. Mar. 22, 2013) (same).

## CONCLUSION

The decision below should be reversed and the case remanded with instructions that the district court grant the motion to compel arbitration.

Dated: January 25, 2024           Respectfully submitted,

                                  MAYER BROWN LLP

                                  */s/ Andrew J. Pincus*
Lucia Nale                        Andrew J. Pincus
MAYER BROWN LLP                   Archis A. Parasharami
71 South Wacker Drive             Kevin S. Ranlett
Chicago, IL 60606                 MAYER BROWN LLP
Telephone: (312) 701-8886         1999 K Street, N.W.
                                  Washington, DC 20006
                                  Telephone: (202) 263-3000
                                  apincus@mayerbrown.com


        *Attorneys for Defendant-Appellant*

## REQUEST FOR ORAL ARGUMENT

Because the issues presented are significant, oral argument could assist this Court in the resolution of this case.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B)(i) and Local Rule 32(b) because it contains 12,788 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.


Dated: January 25, 2024          /s *Andrew J. Pincus*
                                 Andrew J. Pincus

**CERTIFICATE OF SERVICE**

I certify that on January 25, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Andrew J. Pincus*
Andrew J. Pincus