No. 23-2083

IN THE
# United States Court of Appeals for the Fourth Circuit

PABLO ESPIN, et al.,

*Plaintiffs-Appellees*,

*v.*

CITIBANK, N.A.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of North Carolina
No. 5:22-cv-00383-BO-RN, Hon. Terrence Boyle

## APPELLEES' RESPONSE BRIEF

Hannah Kieschnick
PUBLIC JUSTICE
475 14th St., Ste. 610
Oakland, CA 94612
(510) 622-8150

Knoll D. Lowney
Claire E. Tonry
SMITH & LOWNEY, PLLC
2317 E. John St.
Seattle, WA 98112
(206) 860-2883

Leah M. Nicholls
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
LNicholls@publicjustice.net

*Counsel for Plaintiffs-Appellees Pablo Espin, et al.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ........................................................................... 1

STATEMENT OF THE ISSUES ...................................................... 5

STATEMENT OF THE CASE ......................................................... 6

    1.    The Servicemembers Civil Relief Act............................. 6

    2.    The Military Lending Act ................................................ 8

    3.    Factual Background and Plaintiffs' Claims ................ 11

    4.    Relevant Procedural History ........................................ 15

SUMMARY OF ARGUMENT .................................................... 17

ARGUMENT ............................................................................... 21

    I.    Under the SCRA, Plaintiffs Must Be Permitted to
        Bring Class Claims in Federal Court.................................... 22

        A.    The text of § 4042(a)(3) overrides the FAA and
            clearly allows SCRA plaintiffs to bring their class
            claims in court.............................................................. 22

            1.    The plain language of § 4042(a)(3) ensures
                that plaintiffs with SCRA class claims may
                bring their class claims in federal court,
                regardless of any class waiver appearing
                inside or outside an arbitration agreement........ 23

            2.    Legislative history does not indicate that
                Congress intended to exclude class waivers
                appearing in arbitration agreements from
                the statute. ......................................................... 29

            3.    The FAA does not displace Congress's clear
                intent in the SCRA to preclude enforcement
                of class waivers. .................................................. 31

        B.    Section 4042(a)(3) applies to Plaintiffs' claims
            because Citibank's arbitration agreements
            were entered into prior to this civil action. ................. 41

1.  No further retroactivity analysis is required because the statute expressly governs the enforcement of previous agreements. ................. 42

2.  Applying § 4042(a)(3) where the agreement predates the provision's enactment is not a retroactive application. ........................................ 43

3.  Even if a retroactivity analysis were warranted, applying § 4042(a)(3) has no retroactive effect. ................................................. 46

C.  Under § 4042(a)(3), the entirety of Plaintiffs' "civil action" may be brought as a class action in court. ................................................. 49

II. Under the MLA, Plaintiffs cannot be forced to arbitrate their claims. ................................................. 52

A.  Because Plaintiffs used their Citibank credit cards while on active dutyfor purchases after October 2017, the MLA forecloses individual arbitration. ................................................. 52

1.  "Extension of consumer credit" has a well-understood meaning that encompasses both opening a credit-card account and using a credit card. ................................................. 54

2.  "Become obligated" also reflects that "extension of credit" includes credit-card transactions. ........................................ 57

3.  The method for calculating the interest rate under the MLA is consistent with treating credit-card transactions as "extensions of consumer credit." ................................................. 60

4.  No parts of the regulatory framework, including the safe-harbor provision, are to the contrary. ........................................ 61

B.    Section 987(f)(4) of the MLA prohibits enforcing Citibank's arbitration agreement against Plaintiffs on active duty when this case was filed ...... 65

CONCLUSION ......................................................................... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Abhyankar v. Countrywide Fin. Corp.,*
2013 WL 1494457 (ARB Mar. 29, 2013) ............................................. 49

*Am. Express Co. v. Italian Colors Rest.,*
570 U.S. 228 (2013) ................................................................................ 34

*Am. Express Co. v. Koerner,*
452 U.S. 233 (1981) .................................................................... 55, 56, 57

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ................................................................................ 49

*Bank of Am. v. Jarczyk,*
268 B.R. 17 (W.D.N.Y. 2001) ................................................................ 59

*Barclays Bank Del. v. Bamford,*
277 A.3d 151 (Conn. App. Ct. 2022) ..................................................... 59

*Brownback v. King,*
592 U.S. 209 (2021) ................................................................................ 51

*Catanach v. Citi Cards/Bank,*
2008 WL 11451608 (D.N.M. Mar. 18, 2008) ....................................... 57

*Citibank (S.D.) N.A. v. Covaci,*
2014 IL App (Ill. App. Ct. 2014) ........................................................... 59

*CompuCredit Corp. v. Greenwood,*
565 U.S. 95 (2012) ........................................................................ *passim*

*Cunningham v. Bank One,*
487 F.Supp.2d 1189 (W.D. Wash. 2007) .............................................. 57

*Dean Witter Reynolds, Inc. v. Byrd,*
470 U.S. 213 (1985) ................................................................................ 50

*Deweese v. Nat'l R.R. Passenger Corp. (Amtrak),*
590 F.3d 239 (3d Cir. 2009) ............................................................ 44, 45

*Epic Systems Corp. v. Lewis*,
   584 U.S. 497 (2018) ........................................................ 32, 33, 34, 35

*Esquibel v. Chase Manhattan Bank USA, N.A.*,
   487 F.Supp.2d 818 (S.D. Tex. 2007) ....................................... 57

*Frontier-Kemper Constructors, Inc. v. Dir., Off. of Workers'*
   *Comp. Programs*,
   876 F.3d 683 (4th Cir. 2017) ................................................ 42

*Garber v. Harris Trust & Savings Bank*,
   432 N.E.2d 1309 (Ill. Ct. App. 1982) ................................... 59

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) ...................................................... 26, 27, 47

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*,
   637 F.3d 454 (4th Cir. 2011) ................................... 6, 7, 46, 47

*Hayes v. Delbert Servs. Corp.*,
   811 F.3d 666 (4th Cir. 2016) ................................................ 28

*Hess v. Citibank. (S. Dakota), N.A.*,
   459 F.3d 837 (8th Cir. 2006) ................................................ 57

*Jenkins v. Gen. Collection Co.*,
   538 F.Supp.2d 1165 (D. Neb. 2008) ..................................... 59

*Johnson v. Everyrealm, Inc.*,
   657 F.Supp.3d 535 (S.D.N.Y. 2023) ................................. 51, 52

*In re Kemmer*,
   315 B.R. 706 (Bankr. E.D. Tenn. 2004) .............................. 59

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) .............................................. 44, 46, 47

*Langenfeld v. Chase Bank USA, N.A.*,
   537 F.Supp.2d 1181 (N.D. Okla. 2008) .............................. 57

*Le Maistre v. Leffers*,
   333 U.S. 1 (1948) ............................................................. 7

*Lee v. Norfolk S. Ry. Co.*,
802 F.3d 626 (4th Cir. 2015)...................................................29

*Lyons v. PNC Bank, N.A.*,
26 F.4th 180 (4th Cir. 2022) .......................................37, 38

*Lysik v. Citibank, N.A.*,
2017 WL 4164037 (N.D. Ill. Sept. 20, 2017) ......................49

*Martin v. Wells Fargo Bank*,
91 Cal.App.4th 489 (2001) ...................................................57

*In re Mercer*,
246 F.3d 391 (5th Cir. 2001)................................................59

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
473 U.S. 614 (1985) .............................................................38

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .............................................................49

*Moses v. CashCall, Inc.*,
781 F.3d 63 (4th Cir. 2015) .................................................36

*Naturaland Trust v. Dakota Fin. LLC*,
41 F.4th 342 (4th Cir. 2022) ...............................................51

*Olivieri v. Stifel, Nicolaus & Co., Inc.*,
2023 WL 2740846 (E.D.N.Y. Mar. 31, 2023) ......................49

*Perry v. Thomas*,
482 U.S. 483 (1987) .............................................................48

*Pezza v. Investors Capital Corp.*,
767 F.Supp.2d 225 (D. Mass. 2011).....................................49

*Prestige Wine & Spirits, Inc. v. Jules Robin, S.A.*,
686 F.Supp.103 (D. Md. 1988)..............................................66

*Preston v. Ferrer*,
552 U.S. 346 (2008) .............................................................47

*Robertson v. Intratek Computer, Inc.*,
    976 F.3d 575 (5th Cir. 2020)......................................................... 40

*Roselen v. Home Performance All, Inc.*,
    2020 WL 6363886 (M.D. Fla. Oct. 28. 2020)................................. 57

*Sharp Elec. Corp. v. Deutsche Fin. Servs. Corp.*,
    216 F.3d 388 (4th Cir. 2000)......................................................... 59

*Shearson/American Express Inc. v. McMahon*,
    482 U.S. 220 (1987)....................................................................... 31

*Stokeling v. United States*,
    139 S. Ct. 544 (2019).................................................................... 54

*Turner v. Tesla, Inc.*,
    2023 WL 6150805 (N.D. Cal. Aug. 11, 2023) .............................. 52

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2014)......................................................... 50

*In re Ward*,
    857 F.2d 1082 (6th Cir. 1988)....................................................... 59

*Watson v. Blaze Media LLC*,
    2023 WL 5004144 (N.D. Tex. Aug. 3, 2023)................................ 52

*Wong v. CKX, Inc.*,
    890 F.Supp.2d 411 (S.D.N.Y. 2012)....................................... 47, 49

## STATUTES

9 U.S.C. § 401 .................................................................................... 24

9 U.S.C. § 402 .............................................................................. 24, 51

10 U.S.C. § 987................................................................................ *passim*

15 U.S.C. § 1606................................................................................. 54

15 U.S.C. § 1637................................................................................. 54

15 U.S.C. § 1639c......................................................................... 37, 45

15 U.S.C. § 1666.................................................................54

15 U.S.C. § 1679f...............................................................39

15 U.S.C. § 1679g...............................................................39

29 U.S.C. § 157..................................................................33

35 U.S.C. § 24....................................................................25

46 U.S.C. § 41303...............................................................25

50 U.S.C. § 501...................................................................7

50 U.S.C. § 3902..................................................................6

50 U.S.C. § 4042.......................................................... *passim*

Pub. L. No. 111-275...............................................................7

Pub. L. No. 116-92, div. A, title V § 547 ...............................44

## REGULATIONS AND RULES

32 C.F.R. § 232.1.........................................................58, 64

32 C.F.R. § 232.2................................................................58

32 C.F.R. § 232.3....................................................55, 56, 58

32 C.F.R. § 232.5.........................................................62, 63

32 C.F.R. § 232.12...............................................................64

32 C.F.R. § 232.13.........................................................10, 64

214 C.F.R. § 1026.14...........................................................60

Fed. R. Civ. P. 23................................................................25

Fed. R. Civ. P. 39................................................................25

Fed. R. Civ. P. 50................................................................25

Fed. R. Civ. P. 72 .................................................................... 25

Fed. R. Civ. P. 73 .................................................................... 25

## OTHER AUTHORITIES

79 Fed. Reg. 58062 (Sept. 29, 2014) .......................................... 61

80 Fed. Reg. 43560 (July 22, 2015) ................................... *passim*

149 Cong. Rec. 3688 (2003) ....................................................... 6

Consumer Fin. Prot. Bureau, *Military Lending Act (MLA) Interagency Examination Procedures—2015 Amendments* (Sept. 2016) https://files.consumerfinance.gov/f/documents/092016_cfp b_MLAExamManualUpdate.pdf ......................................... 55

Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf ........................... 8, 9, 10

Off. of the Under Sec'y of Def. for Pers. & Readiness, *Dep't of Def., Department of Defense Annual Report on the Financial Literacy and Preparedness of Members of the Armed Forces* (2022), https://finred.usalearning.gov/assets/downloads/FINRED-2022-FinancialLiteracy-R.pdf .............................................. 9

S. Bill 1790, § 550H (116th Cong.) (Sept. 17, 2019) https://www.congress.gov/116/bills/s1790/BILLS-116s1790eah.pdf .............................................................. 30, 43

*The Servicemembers Civil Relief Act (SCRA)* Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/consumer-tools/educator-tools/servicemembers/the-servicemembers-civil-relief-act-scra/ .................................................................. 7

ix

U.S. Gov't Accountability Off., *Servicemember Rights: Mandatory Arbitration Clauses Have Affected Some Employment and Consumer Claims but the Extent of Their Effects is Unknown* 9-10 (Feb. 2021) https://www.gao.gov/assets/gao-21-221.pdf ........................................ 31

## INTRODUCTION

Plaintiffs are current or former servicemembers who have served our nation honorably. Congress enacted the Servicemembers Civil Relief Act (SCRA) and Military Lending Act (MLA) to protect servicemembers like Plaintiffs from financial hardship and stress at home so that they can focus on protecting and serving our country. The Department of Defense (DoD) itself pushed to expand these protections because servicemembers are particularly vulnerable to high-cost debt and because excessive debt among servicemembers had become a national security issue. To that end, among other things, both statutes regulate the terms of credit available to active-duty members of the military, including limitations on interest rates.

Because servicemembers face unique and difficult challenges in seeking redress for financial harms, a key component of both statutory schemes is ensuring that servicemembers can effectively enforce their rights under the SCRA and MLA. They do so by outlawing or rendering unenforceable fine-print waivers that credit-card companies like Defendant Citibank, N.A. routinely insert into their take-it-or-leave-it credit terms: class-action waivers and arbitration clauses.

In particular, the 2019 amendments to the SCRA provide that a person with an SCRA claim can bring class claims "in accordance with the Federal Rules of Civil Procedure, notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a)(3). In other words, servicemembers with SCRA class claims can bring their claims on a classwide basis, in federal court—regardless of whether their credit-card agreement contains a class-action waiver.

The MLA goes a step further, making it unlawful for a creditor to extend credit to servicemembers on the condition that they waive their SCRA rights to legal recourse or agree to arbitration in the first place. *See* 10 U.S.C. § 987(e)(2)-(3). The MLA also makes those unlawful agreements void and makes agreements to arbitrate unenforceable where the MLA applies. 10 U.S.C. § 987(f)(3)-(4).

Here, Plaintiffs brought class claims against Citibank primarily under the SCRA. They allege Citibank illegally forces servicemembers to jump through unnecessary hoops to demonstrate that they are on active duty and entitled to SCRA benefits like an interest-rate reduction— hoops that are particularly difficult for deploying servicemembers to navigate. They also allege that Citibank entices servicemembers to take

on debt by offering a zero-percent interest rate for active-duty servicemembers, only to increase that rate up to almost 26 percent when servicemembers return from deployment, all without the warnings required by law. That jump in interest rate is problematic both because it comes as a financial shock to vulnerable military families, and because Citibank improperly calculates how interest has accrued under the SCRA.

On appeal, Citibank tries to avoid the application of the SCRA and MLA's provisions requiring that Plaintiffs' class claims be permitted to proceed in court. It can't.

First, the straightforward language of the SCRA precludes the enforcement of Citibank's class-action waiver by providing that an SCRA plaintiff with class claims like Plaintiffs can proceed with their class action "notwithstanding any previous agreement to the contrary." *See* 50 U.S.C. § 4042(a)(3). Citibank ties itself in knots contending that Congress excluded class waivers in arbitration agreements from the statute's reach, but Congress said nothing of the sort: The statute applies to *any* previous agreement. Nor can the Federal Arbitration Act (FAA) offer Citibank a lifeline as Congress followed the blueprint laid out by the

Supreme Court in *Epic Systems* for ensuring its ban on the enforcement of class-action waivers overrides the FAA's otherwise-applicable rule that such waivers can be enforced.

The MLA also precludes enforcement of Citibank's arbitration agreement. The MLA regulations were revised in 2015 to align the definition of "consumer credit" with that in the Truth in Lending Act (TILA) and extend MLA protections to credit cards. Particularly relevant here, these regulations imported TILA's definition of "extends consumer credit," which covers both opening a credit-card account *and* making credit-card purchases. Because Plaintiffs used their Citibank cards to make purchases while on active duty after the 2015 regulations became effective, the MLA's prohibitions on the formation and enforcement of arbitration agreements when a creditor "extends consumer credit" apply here. Citibank's contrary arguments can't overcome the established meaning of "extension of consumer credit."

Through the SCRA and MLA, Congress ensured servicemembers would be able to vindicate their statutory rights by prohibiting the enforcement of agreements that waive class actions or require arbitration. Those statues control here and the district court's order

denying Citibank's motion to compel individual arbitration should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the 2019 amendments to the Servicemembers Civil Relief Act, which provide that a person with an SCRA claim may be a class representative or be a member of a class "in accordance with the Federal Rules of Civil Procedure, notwithstanding any previous agreement to the contrary," prohibits the enforcement of pre-dispute class-action waivers when they appear in arbitration agreements as well as when they do not.

2.      Whether the 2019 SCRA amendments, which prohibit enforcement of class-action waivers in "any previous agreement[s]," apply when the agreements were made previously to the amendments' enactment.

3.      Whether the 2019 SCRA amendments, which apply when a person with an SCRA claim brings a "civil action," apply to the civil action as a whole, or only the SCRA claims.

4. Whether the definition of "extension of consumer credit" under the Military Lending Act includes credit-card purchases, as it does under the Truth in Lending Act.

5. Whether the MLA's prohibition on the enforcement of arbitration agreements against any covered borrower applies regardless of when the extension of credit occurred.

## STATEMENT OF THE CASE

### 1. The Servicemembers Civil Relief Act

The SCRA is designed to alleviate financial stressors on active-duty members of the military and their families so that they can "devote their entire energy" to their military service. *See* 50 U.S.C. § 3902; *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 457-58 (4th Cir. 2011). "It is crucial that our troops not worry about financial issues at home when they are in harm's way abroad." 149 Cong. Rec. 3688, 3700 (2003). To that end, among other things, the SCRA caps the interest rate on pre-service loans at six percent during the period of active duty, permits early termination of residential and automotive leases, and places limits on judicial proceedings, including protections against default judgments,

foreclosure, and repossession. 50 U.S.C. § 501 *et seq*.; *Gordon*, 637 F.3d at 458.[1]

The SCRA "must be read with an eye friendly to those who dropped their affairs to answer their country's call." *Le Maistre v. Leffers*, 333 U.S. 1, 6 (1948) (interpreting SCRA predecessor statute). To that end, courts should not read the SCRA narrowly to "restrict its application" because doing so would require "drastically contracting the language of [the SCRA] and closing [its] eyes to [the statute's] beneficent purpose." *Id*. at 4-6; *see also Gordon*, 637 F.3d at 458.

The statute—which was re-enacted in 2003—has been amended numerous times to expand protections. For example, in 2010, it was amended to add a private right of action. Pub. L. No. 111-275; *see Gordon*, 637 F.3d at 457. Relevant here, Congress amended the private right of action provision in 2019 to allow SCRA litigants to pursue class actions in federal court, regardless of any pre-dispute agreements to the contrary. Section 4042(a) now reads:

(a)  In general

---

[1] *See also The Servicemembers Civil Relief Act (SCRA)*, Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/consumer-tools/educator-tools/servicemembers/the-servicemembers-civil-relief-act-scra/.

Any person aggrieved by a violation of this chapter may in a civil action—

(1) obtain any appropriate equitable or declaratory relief with respect to the violation;

(2) recover all other appropriate relief, including monetary damages; and

(3) be a representative party on behalf of members of a class or be a member of a class, in accordance with the Federal Rules of Civil Procedure, notwithstanding any previous agreement to the contrary.

## 2. The Military Lending Act

While the SCRA offers important protections to servicemembers and their families, its protections proved insufficient to prevent a debt crisis among members of the military. Military members are prime targets for predatory lenders because they are typically young, inexperienced at managing finances, and often receiving their first substantial paycheck. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 10 (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf (2006 DoD Report). Military indebtedness impacts not just the lives of military

families, but also our nation's military readiness and national security. In response, Congress enacted the MLA in 2006 at the behest of the DoD.[2]

The MLA governs the terms on which a lender can extend consumer credit to active-duty servicemembers and their dependents.[3] For example, the MLA caps interest rates, including all finance charges, whether or not labeled as "interest." 10 U.S.C. § 987(b). And critically, the MLA prohibits creditors from including terms that purport to require borrowers to submit to arbitration or to waive their right to legal recourse under the SCRA. 10 U.S.C. § 987(e)(2)-(3).[4] Indeed, recognizing that consumer loan agreements are take-it-or-leave-it contracts, the DoD report that led to the MLA stressed that servicemembers should not be

---

[2] *See* Off. of the Under Sec'y of Def. for Pers. & Readiness, *Dep't of Def., Department of Defense Annual Report on the Financial Literacy and Preparedness of Members of the Armed Forces* 11 (2022), https://finred.usalearning.gov/assets/downloads/FINRED-2022-FinancialLiteracy-R.pdf (noting the MLA was primarily a response to the 2006 DoD study describing predatory loan and credit products); *see also* 2006 DoD Report; JA289-296.

[3] This Brief uses "servicemember" as shorthand for those who fall within the protections of the SCRA and MLA, both of which protect active-duty members of the military and their dependents.

[4] Thus, creditors who extend covered credit with class waivers after the 2019 SCRA amendments violate the MLA.

9

forced by lenders to give up "full legal recourse" by being subject to forced arbitration. 2006 DoD Report 51.

The MLA includes both criminal and civil enforcement. *See* 10 U.S.C. § 987(f)(1) (knowing violations are misdemeanors), § 987(f)(5) (providing private right of action, including statutory damages, punitive damages, and attorney's fees). Any contract prohibited by the MLA "is void from the inception," § 987(f)(3), and the statute provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any [servicemember], or any person who was a [servicemember] when the agreement was made," § 987(f)(4).

Congress largely left to the Secretary of Defense the job of defining "consumer credit" by regulation. 10 U.S.C. § 987(h)(2)(D), (i)(6). While DoD's initial regulations did not include credit cards, DoD expanded the definition of "consumer credit" in 2015 to match the definition of "consumer credit" in the Truth in Lending Act. 80 Fed. Reg. 43560, 43560 (July 22, 2015). That expanded definition, which went into effect October 2017, includes credit extended in a credit-card account. 32 C.F.R. § 232.13(c)(1).

DoD expanded the definition of "consumer credit" because the original narrower scope did "not effectively provide the protections intended to be afforded to Service members and their families under the MLA." 80 Fed. Reg. at 43566. Forty Senators submitted comments supporting the regulation, explaining it was needed to close "existing MLA loopholes" and "prevent[] future evasions of the requirements of the MLA." *Id.* In particular, DoD recognized that many credit cards carry high interest rates and therefore needed to be covered to effectuate Congress' intent to prevent servicemembers from becoming mired in debt traps. *See id.* at 43567.

### 3. Factual Background and Plaintiffs' Claims

Each of the Plaintiffs served honorably in the U.S. military. Each also used a Citibank credit card to make purchases while on active duty after the 2017 expansion of the MLA's definition of "consumer credit" went into effect. Citibank markets heavily to servicemembers, in part by promising benefits more generous than those required by the SCRA and MLA. JA12. Specifically, when Citibank acknowledges a customer's active-duty status, it offers a special servicemember contract with 0% interest on existing balances and new transactions. JA298. It urges

servicemembers to "get the most out of your account" by making "new transactions." *Id.*

But what Citibank fails to communicate is that when servicemembers are no longer active-duty, their entire credit-card balance—including purchases made before and while on active-duty—jumps from 0% to up to nearly 26%. JA22, 25. This dramatic and often unanticipated increase frequently places substantial financial hardship on servicemembers at the already difficult time when they are transitioning from military to civilian life.

And that's if servicemembers get Citibank to acknowledge their active-duty status at all. Citibank regularly withholds military benefits under the guise of requiring additional and unnecessary documentation, despite its access to the database that verifies active-duty status. JA25-26.

Plaintiff Pablo Espin actively served from 2010 until 2022, including deployments to Afghanistan and Qatar. JA19-20. He used his Citibank credit card, which he opened in 2014, while on active duty. JA53, 61. At the conclusion of his military career, Mr. Espin carried a

substantial credit-card balance such that an increase in interest would cause him financial hardship. JA20.

Plaintiff Nicholas Padao served as a member of the National Guard from 2003, including on active duty while deployed in Iraq from 2018 to 2019, until he retired in 2022. JA20-21. Mr. Padao originally opened a credit-card account with American Express, but his account was transferred to Citibank in 2016. JA55-56. Prior to his 2018 deployment, Mr. Padao sent his activation orders to Citibank and spoke with Citibank representatives over the phone several times. JA21. While that documentation was sufficient to receive military benefits from other banks, Citibank requested additional information, which Mr. Padao was unable to provide because he was in the process of deployment. JA21. He never received SCRA and MLA benefits from Citibank while on active duty. JA21.

Plaintiff Sergeant Jeremy Bell has served on active duty since 2009. JA21. Sergeant Bell opened his Home-Depot branded Citibank credit-card account in 2014 and used that card while on active duty. JA179-180. Citibank terminated him from its military benefits program. JA22. Prior to being terminated, Sergeant Bell's Citibank statements reflected a

"balance subject to interest rate" of $0.00. JA22. The first month after being terminated from the military-benefits program, however, his statement showed an interest rate of 25.99% and a balance subject to that interest rate of over $10,000. JA22. Sergeant Bell was barely able to make the minimum payments on his Citibank card and resorted to purchasing gift cards from Home Depot on his Citibank card to feed his family. JA23.

Plaintiff Keith Taylor began serving in 1994, including multiple deployments to Afghanistan and Iraq, and retired in 2022. JA23. Mr. Taylor opened a Citibank credit-card account in 2013. JA57. Like Sergeant Bell's, Mr. Taylor's Citibank statements while part of Citibank's military-benefits program reflected a "balance subject to interest rate" of $0.00. JA24. The first month after being terminated from the program, his statement reflected a balance of over $5,000 subject to an interest rate of almost 16%. JA24-25.

At the time Citibank offered each Plaintiff servicemember account terms through its military-benefits program (or, in the case of Mr. Padao, who was never offered such terms, had their existing credit-card account transferred to Citibank), the bank's account terms included an

arbitration agreement with a class-action waiver. JA73, 141, 190. In 2015 and 2016, Citibank unilaterally amended its arbitration agreement, including the procedures of arbitration and the severability clause, which now made clear that if the class waiver were unenforceable, class proceedings would occur in court and not arbitration. JA100-101, 121-122, 168-169, 217-218.

**4. Relevant Procedural History**

Plaintiffs brought this class action against Citibank in September 2022. JA4. They allege Citibank violated the SCRA by failing to grant SCRA benefits to qualifying servicemembers, forgive interest above six percent, and properly calculate retroactive adjustments. JA31-33. They allege Citibank violated the MLA by imposing arbitration agreements on servicemembers after October 2017 and failing to provide MLA-required notices. JA34-36. Plaintiffs also allege Citibank violated TILA as well as state law. JA36-41.

Citibank moved to compel individual arbitration of Plaintiffs' claims based on the arbitration agreement, including its class waiver, in its account terms. ECF 22. Plaintiffs opposed, arguing that compelling individual arbitration was foreclosed by the SCRA, 50 U.S.C.

15

§ 4042(a)(3), and the MLA, 10 U.S.C. § 987(e)(2)-(3), (f)(3)-(4), and that Citibank's agreements were unconscionable. ECF 27. The United States filed a statement of interest contending that the arbitration agreement and class waiver were unenforceable under § 4042(a)(3) of the SCRA. ECF 29.

The district court denied Citibank's motion. JA311-317. The court explained that § 4042(a)(3) of the SCRA "made clear that, notwithstanding any agreement to the contrary, servicemembers may bring and participate in class actions to enforce the provisions of the SCRA." JA314. Because Citibank's arbitration agreement's severability clause expressly provided there could be no class arbitration, Plaintiffs could bring their SCRA-guaranteed class action in court. *Id.* The district court rejected Citibank's argument that the § 4042(a)(3) didn't apply to agreements formed before its 2019 enactment, explaining "[i]t is plain from the language of the SCRA amendment that Congress intended the class-action protections to extend to agreements entered into prior to its passage." JA315. But even if Congress weren't sufficiently clear, statutes—like the SCRA amendment—that grant or strip jurisdiction take away no substantive rights and may be applied retroactively. *Id.*

16

Finally, the court rejected Citibank's argument that the FAA overrides the SCRA and mandates individual arbitration of Plaintiffs' claims. It explained that Congress "evinced its intent to proscribe waivers of the right to pursue relief as a class in federal court" by both "providing servicemembers with an unwaivable right to participate in a class action" and specifying "that those actions may be filed in accordance with the Federal Rules of Civil Procedure, which are generally not fully applicable in arbitration proceedings." JA316.

The district court did not reach the parties' MLA arguments.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's decision denying Citibank's motion to compel arbitration on the grounds that the SCRA precludes enforcement of Citibank's class-waiver and arbitration agreement. This Court can also affirm on the ground that the MLA precludes enforcement of Citibank's agreement to arbitrate.

**I.** The SCRA preludes enforcement of Citibank's class waiver and agreement to arbitrate. The straightforward text of § 4042(a)(3), added to the SCRA in 2019, shows Congress intended to preclude enforcement of *all* class-action waivers for those bringing SCRA claims, regardless of

17

whether the waiver is part of an agreement to arbitrate or not. Further, because Congress provided that SCRA class actions are to proceed "in accordance with the Federal Rules of Civil Procedure," Congress intended for those class actions to proceed in court. But even that weren't true, Citibank's own arbitration agreement provides that if its class-action waiver is unenforceable, class claims must be heard in court, not arbitration.

Citibank's contrary argument—that Congress intended to exclude class-action waivers in arbitration agreements from the reach of the statute—is both contrary to the text, which provides for no such exception, and is foreclosed by the Supreme Court's decisions in *CompuCredit* and *Gilmer*, which held that similarly structured statutes applied to disputes in which there were agreements to arbitrate.

The FAA does not override Congress's clear intent that class-action waivers be unenforceable. Arbitration agreements are only enforceable absent "contrary congressional command," and § 4042(a)(3) is such a command by, consistent with *Epic Systems*, expressly mandating the procedures for dispute resolutions and expressly stating that contractual waivers are unenforceable.

Section 4042(a)(3) applies to Plaintiffs' claims here regardless of whether they entered into the class-waiver contracts with Citibank before or after that provision was enacted in 2019. Congress expressly provided that the right to bring a class action survived "*any previous agreement to the contrary.*" The only logical reading of that language is that it encompasses *any* pre-dispute or pre-enactment agreement. But even if Congress had not been so clear, there is no retroactivity problem with applying § 4042(a)(3) to pre-enactment contracts because the event carrying "legal significance" is the filing of a civil action for class claims, not the formation of the contract, and that legally significant event was after 2019. Further, because § 4042(a)(3) addresses only procedure and forum—class action proceedings and arbitration—it can have no retroactive effect on Citibank's rights.

Finally, because Congress used "civil action" rather than "claim," § 4042(a)(3) applies to the entirety of the suit brought by a person with SCRA claims, not just the SCRA claims. As such, all of Plaintiffs' class claims may be brought in federal court.

**II.** The MLA also precludes enforcement of Citibank's arbitration agreement. Under the MLA, extensions of consumer credit made to

19

active-duty servicemembers may not include arbitration agreements, nor may they include waivers of rights to legal recourse under the SCRA. The MLA renders any such illegal contracts void and also expressly makes arbitration agreements unenforceable. In 2015, DoD expanded the definition of "consumer credit" to include "credit extended in a credit card account," with an effective date in October 2017. Because each of the Plaintiffs made purchases with their Citibank credit cards while on active duty after October 2017, and credit-card purchases are "extensions of consumer credit," Citibank's arbitration agreement is not enforceable.

The Supreme Court has unequivocally held that "extension of consumer credit" in TILA includes purchases made with credit cards. And because the MLA and its regulations were designed to mirror and be interpreted in parity with TILA, this definition of "extension of consumer credit" applies with equal force here.

The MLA regulations reinforce this understanding. They define "covered borrower" as a servicemember who is on active duty when they open a credit account *or* when they "become obligated" on a credit transaction which, in the context of credit cards, means using a card to make a purchase. Further, the MLA's interest-rate cap applies to

20

"consumer credit extended," and is calculated based on finance charges applied to particular credit-card transactions.

The regulations' safe-harbor provision, relied on heavily by Citibank, is not to the contrary. That provision merely provides that if creditors use a certain optional method to determine whether a consumer is a covered borrower, they have some protection from liability. It says nothing about what constitutes an extension of credit and, in any event, Citibank has not argued it is entitled to the MLA's safe harbor.

Finally, under § 987(f)(4) of the MLA, Citibank cannot enforce its arbitration agreement against those Plaintiffs who were or are on active-duty at the time this suit was filed because the provision expressly applies to currently covered borrowers.

## ARGUMENT

The SCRA and MLA together protect servicemembers from financial hardship so that servicemembers can focus on their military duties. In DoD's view, these protections are vital for protecting national security. A critical component of the SCRA and MLA is ensuring servicemembers alleging violations of their statutory rights can bring those claims in court, and, under the SCRA, on a class-wide basis.

21

Plaintiffs are current or former members of the military who have each served on active duty and who seek to enforce the rights of servicemembers under the SCRA and MLA. Under both of those statutes, they have the right to bring those claims in court, notwithstanding Citibank's class-action waiver and arbitration agreement.

## I. Under the SCRA, Plaintiffs Must Be Permitted to Bring Class Claims in Federal Court.

### A. The text of § 4042(a)(3) overrides the FAA and clearly allows SCRA plaintiffs to bring their class claims in court.

Section 4042(a)(3)—entitled "Preservation of right to bring class action under Servicemembers Civil Relief Act"—is straightforward. It guarantees that a person with SCRA claims may bring their case on behalf of a class in federal court, regardless of any prior agreement waiving that right: "Any person aggrieved by a violation of [the SCRA] may in a civil action— . . . be a representative party on behalf of members of a class or be a member of the class, in accordance with the Federal Rules of Civil Procedure, notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042.

Despite this language, Citibank attempts to limit the SCRA's prohibition to only stand-alone class waivers (that is, those in contracts

22

without arbitration agreements). *See* Citibank Br. 28-30. Citibank fails to explain why Congress would be concerned with ensuring class procedures for some, but not all, servicemembers with SCRA claims. Quite the opposite: The plain text makes clear that Congress intended the right to a class action to apply regardless of "*any*" prior agreement to the contrary—including Citibank's arbitration agreement. The legislative history is in accord. And while Citibank also argues the FAA requires that the class waiver in its arbitration agreement be enforced, the FAA poses no barrier to adjudicating Plaintiffs' class claims in federal court. In enacting § 4042(a)(3), Congress followed the Supreme Court's direction in *Epic Systems* for making clear class-action waivers would be unenforceable, even when they appear in arbitration agreements.

> 1. *The plain language of § 4042(a)(3) ensures that plaintiffs with SCRA class claims may bring their class claims in federal court, regardless of any class waiver appearing inside or outside an arbitration agreement.*

**First,** the text of this section makes clear Congress intended to preclude enforcement of *all* "previous agreement[s]," including arbitration agreements, that purport to waive class claims. Citibank contends that § 4042's prohibition can't apply to class waivers in arbitration agreements because the provision doesn't specifically

reference arbitration. Citibank Br. 29. But the provision need not distinguish between types of contracts because it explicitly applies "notwithstanding *any* previous agreement." 50 U.S.C. § 4042(a)(3) (emphasis added). The only logical reading of that language is that Congress intended for *all* class waivers to be unenforceable, regardless of the type of agreement in which they appear. Citibank contrasts § 4042 with the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (EFASASHA), which prohibits the enforcement of "predispute joint-action waiver[s]" "whether or not part of a predispute arbitration agreement." Citibank Br. 34-35; 9 U.S.C. §§ 401(2), 402(a). But because the title of EFASASHA expressly references arbitration, Congress was likely making clear that the ban on enforcement of joint-action waivers applied even *outside* the context of arbitration agreements. Further, that Congress could have added more words to § 4042 does not change the fact that the provision applies to "any" prior agreements and doesn't distinguish between arbitration and not-arbitration.

**Second**, § 4042(a)(3)'s specific invocation of the Federal Rules of Civil Procedure makes clear that Congress intended the person bringing

SCRA class claims to be able to do so *in federal court*. That's because the Federal Rules are incompatible with any other forum. For example, Rule 23 provides for a discretionary immediate appeal to a federal court of appeals of decisions granting or denying certification of class actions and provides court-specific instructions for seeking such an appeal. Fed. R. Civ. P. 23(f). Such an appeal would be unavailable outside of federal court. Similar rules abound: Rules 72 and 73 provide for adjudication by magistrate judges; Rule 39 discusses the "federal right" to a jury trial; and Rule 50 provides for appellate review of certain trial motions. Fed. R. Civ. P. 39, 50, 72-73.

Moreover, Congress invoked the full body of the Federal Rules of Civil Procedure: Section 4042(a)(3) states "in accordance with the Federal Rules of Civil Procedure." In contrast, where Congress intends to incorporate only some of the Federal Rules into another forum, it says so. *See, e.g.*, 35 U.S.C. § 24 (providing that the Rules "relating to the attendance of witnesses and to the production of documents and things shall apply to contested cases in the Patent and Trademark Office"); 46 U.S.C. § 41303(a)(2) (providing that in adjudicatory proceedings in the

Federal Maritime Commission, parties may use discovery procedures "that, to the extent practicable, shall conform to the" Rules).

Citibank agrees that the Federal Rules apply in court, not arbitration. *See* Citibank Br. 29. But it then inexplicably concludes that, by referencing the Federal Rules, Congress must have meant that the SCRA's prohibition on class waivers only applies outside the arbitration agreement. But Congress didn't say that the Federal Rules don't apply when there's an agreement to arbitrate. It said the opposite: that those with SCRA claims can proceed as a class under the Federal Rules "notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a)(3). The express purpose of the provision was to override pre-dispute agreements that would preclude class actions in federal court, not to enforce them.

***Third***, Congress's use of the phrase "civil action" does not support Citibank's argument that Congress's use of that phrase in § 4042(a)(3) means the statute does not apply where the parties have an arbitration agreement. *See* Citibank Br. 29. That's both nonsensical and foreclosed by the Supreme Court's decisions in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), and *CompuCredit Corp. v. Greenwood*, 565 U.S.

95 (2012). *CompuCredit* explains that it is "commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit." 565 U.S. at 100. But such language does not itself foreclose application of the statute in arbitration. *Id.* at 100-01. The Court listed as an example the statute in *Gilmer*, which, like the SCRA, provided that "[a]ny person aggrieved may bring a civil action" to seek relief for violations of the statute. *Id.* at 101. *Gilmer* held that the phrase "civil action" embraced both litigation *and* arbitration. 500 U.S. at 35. In short, the term "civil action" does not mean § 4042 applies only where there is no arbitration agreement.

What is more, Citibank's "civil action" argument, if correct, would also mean that Congress chose to strip federal statutory rights from individuals with arbitration agreements in an extremely subtle—and unlikely—way. Section 4042 is not just about class actions. It also provides the SCRA's private right of action and the ability for individuals to seek monetary damages for violations of the statute. 50 U.S.C. § 4042(a)(1)-(2). If the mere use of "civil action" meant that the statute does not apply when there is an arbitration agreement, the statute would

entirely foreclose individuals with arbitration agreements from bringing *any* SCRA actions for damages, whether individually or as a class and whether in arbitration or in court. Given that, normally, arbitration cannot be used to strip federal statutory rights, that would be a bizarre reading indeed. *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-75 (4th Cir. 2016).

Citibank is also wrong that the mere existence of an arbitration agreement categorically means that a party "does not have the right to bring an action in court." Citibank Br. 29. If nothing else, that's not what Citibank's agreement says. Rather, Citibank's agreement provides that either party "*may* elect arbitration." JA73 (emphasis added); *see also* JA74. Arbitration is only required *if* a party compels it. If not, parties have the right to proceed in court.

To be clear, Plaintiffs do not argue that § 4042(a)(3) prohibits all arbitration. Nothing in the SCRA prevents the enforcement of arbitration agreements in the context of individual disputes or any other representative or joint actions that are not class actions. But it does

prevent the enforcement of class waivers, regardless of the type of contract in which they appear.[5]

> 2. *Legislative history does not indicate that Congress intended to exclude class waivers appearing in arbitration agreements from the statute.*

Finding no help in the text of the statute, Citibank points to the legislative history of the 2019 SCRA amendment to contend Congress did not intend to preclude class waivers in arbitration agreements. Citibank Br. 41. Not only does this Court not need to reach the legislative history—the statute is clear, *see Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015); *supra* Part I.A.1—but also the legislative history doesn't help Citibank. Citibank argues Congress made a deliberate choice by omitting language that would have invalidated pre-dispute arbitration provisions, but fails to acknowledge the difference between bans on enforcement of arbitration agreements and bans on enforcement of class waivers. Congress expressly chose to prohibit class waivers and its indecision on matters of individual arbitration has no bearing on that choice.

---

[5] The MLA, on the other hand, *does* preclude arbitration entirely where it applies. *See infra* Part II.

Congress considered but did not enact a version of the 2019 SCRA amendments that would have separately foreclosed pre-dispute arbitration agreements. S. Bill 1790 at § 550H (116th Cong.) (Sept. 17, 2019).[6] The best interpretation of § 550H is that it would have addressed arbitration in the context of *individual* claims. That's because Congress would have understood the proposed § 4042(a)(3) to address the enforceability of class waivers, whether in arbitration agreements or not. As such, the legislature would have had to *also* enact § 550H to address individual arbitration. In sum, the proposed prohibition on pre-dispute arbitration and the enacted § 4042(a)(3) address two distinct issues, and the unenacted provision regarding individual arbitration has no bearing on the enacted prohibition on class waivers.

Further grasping at straws, Citibank argues that the 2019 SCRA amendment's direction that the Comptroller General conduct a study of arbitration, as well as the resulting study, somehow mean § 4042(a)(3) doesn't apply to class waivers contained in arbitration agreements. *See* Citibank Br. 37-38. But again, that provision expressly protects class

---

[6] https://www.congress.gov/116/bills/s1790/BILLS-116s1790eah.pdf.

actions. The study, by contrast, focuses on *individual* arbitration. And Citibank overstates the role of class waivers in the resulting GAO study: In its one paragraph devoted to the topic, the study observed that, in SCRA cases prior to the enactment of § 4042(a)(3), arbitration agreements with class waivers had served their intended purpose of eliminating class liability. U.S. Gov't Accountability Off., *Servicemember Rights: Mandatory Arbitration Clauses Have Affected Some Employment and Consumer Claims but the Extent of Their Effects is Unknown* 9-10 (Feb. 2021).[7]

### 3. The FAA does not displace Congress's clear intent in the SCRA to preclude enforcement of class waivers.

The FAA does not override § 4042(a)(3)'s prohibition on the enforcement of class waivers when the waiver is part of an agreement to arbitrate. While the FAA generally requires that valid arbitration agreements be enforced—including class waivers that appear in such agreements—that mandate may be "overridden by a contrary congressional command." *CompuCredit*, 565 U.S. at 98 (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

---

[7] https://www.gao.gov/assets/gao-21-221.pdf.

Section 4042(a)(3), which provides that servicemembers with SCRA claims may bring class actions under the Federal Rules "notwithstanding any previous agreement to the contrary," is just such a contrary congressional command.

>    a.    In enacting § 4042(a)(3), Congress followed the instructions in *Epic Systems* for rendering class waivers in arbitration agreements unenforceable.

In crafting § 4042(a)(3), Congress followed the roadmap to override the FAA and ensure the right to proceed with class litigation laid out by the Supreme Court in *Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018). *Epic Systems* addressed a question similar to the one presented here: whether a federal statute clearly enough provides a right to bring a class action such that an arbitration agreement waiving that right would be unenforceable. *Id.* at 502-03. The answer in that case was no, but the analysis makes clear what a statute must do to sufficiently provide a right to proceed on a class basis in federal court: include a "specific statutory discussion" of either "arbitration or class actions" so as to reflect Congress's intent to "displace[] the Arbitration Act." *Id.* at 517.

In *Epic Systems*, the plaintiffs argued the catch-all right under the National Labor Relations Act (NLRA) for workers "to engage in other

concerted activities for the purpose of collective bargaining or other mutual aid or protection" amounted to a right to bring class litigation notwithstanding the existence of an arbitration agreement with a class waiver. *Id.* at 502-04, 511 (quoting 29 U.S.C. § 157). The Supreme Court found this text, and the context of the NLRA more broadly, insufficient to displace the usual FAA rule that arbitration agreements with class waivers are enforceable. *Id.* at 511-19. For one, class action procedures hardly existed when Congress enacted the NLRA's catch-all right. *Id.* at 511-12. Further, as a matter of statutory construction, the catch-all right must be read in light of the list of other rights in which it appears—all of which focus on employees' rights "in the workplace." *Id.* at 512-13. And while the NLRA extensively regulates collective-bargaining rights, its "careful regime" gave no "hint about what rules should govern the adjudication of class or collective actions in court or arbitration" *Id.* at 513.

Had Congress intended to "mandate particular dispute resolution procedures," it would have "clearly" provided "the procedures for resolving 'actions,' 'claims,' 'charges,' and 'cases.'" *Id.* at 514. Because Congress did not, parties take "existing class and collective action rules

33

as they find them . . . including the principle that parties may (as here) contract to depart from them in favor of individualized arbitration procedures of their own design." *Id.* That was consistent with past jurisprudence on the intersection of the FAA and other federal statutory rights, which "stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the [FAA]." *Id.* at 517; *see also id.* at 517 (describing *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), which stressed that the Sherman Act "made 'no mention of class actions' and was adopted before Rule 23 introduced its exception to the 'usual rule' of 'individual' dispute resolution").

With *Epic Systems* fresh off the press, Congress crafted § 4042(a)(3) to do exactly what the NLRA did not. For starters, § 4042(a)(3) expressly provides that a servicemember with an SCRA claim may be a representative "on behalf of members of a *class* or be a member of a *class*" "in a *civil action*." 50 U.S.C. § 4042(a)(3) (emphasis added). That is, unlike the NLRA, or the Sherman Act in *Italian Colors*, § 4042 expressly discusses class actions and places that discussion in the context of courtroom proceedings.

34

Further, unlike the NLRA, § 4042(a)(3) expressly provides the governing procedures: the Federal Rules of Civil Procedure. Not only that, but § 4042(a)(3) explicitly departs from the usual "principle that parties may . . . contract to depart from them in favor of individualized arbitration procedures of their own design," *Epic Systems*, 584 U.S. at 514: Section 4042(a)(3) says that class actions may be brought under the Federal Rules "notwithstanding any previous agreement to the contrary." In short, in enacting § 4042(a)(3), Congress followed the roadmap the Supreme Court laid out in *Epic Systems* for making clear that class actions may be brought in court, regardless of any agreement to arbitrate claims individually.

> b. Other jurisprudence from this Court and Supreme Court confirm that § 4042(a)(3) overrides the FAA.

Consistent with *Epic Systems*, other FAA caselaw confirms that § 4042(a)(3) displaces the usual rule that arbitration agreements are enforceable, regardless of whether it specifically references "arbitration." After all, here, it makes sense that the statute doesn't say "arbitration" because Congress did not intend to override agreements to arbitrate generally and § 4042(a)(3) doesn't prevent enforcement of arbitration agreements in the context of individual disputes. Rather, Congress

intended to override agreements to waive class claims wherever those waivers appear.

Indeed, this Court has held that arbitration agreements are not necessarily enforceable where they conflict with other federal statutory regimes—even where the statute does not expressly refer to arbitration. *Moses v. CashCall, Inc.*, 781 F.3d 63, 72-73 (4th Cir. 2015), affirmed the lower court's denial of a motion to compel arbitration on the ground that requiring arbitration of constitutionally core bankruptcy claims "would pose an inherent conflict with the Bankruptcy Code." This Court reasoned that a "principal purpose" of the Bankruptcy Code is to provide for prompt and efficient settlement of a debtor's estate by "centraliz[ing] disputes over the debtor's assets and obligations in one forum." *Id.* at 72. Because sending a constitutionally core claim to arbitration would greatly undermine the process envisioned by Congress, arbitration agreements need not be enforced in that context. *Id.* at 73. Although the Bankruptcy Code does not expressly reference arbitration, this Court still ruled that enforcement of arbitration agreements in that context would be contrary to clear congressional intent.

36

More recently, *Lyons v. PNC Bank, N.A.*, 26 F.4th 180, 187 (4th Cir. 2022), interpreted a provision of Dodd-Frank to prohibit enforcing arbitration agreements in loans secured by homes, even though the particular provision at issue did not use the word "arbitration." While the provision was contained in a statutory section entitled "arbitration"—giving clues as to Congress' intent—it wasn't the use of the word "arbitration" that drove this Court's reasoning. Rather, it was the framing of the provision: It didn't just grant a right, it expressly prohibited the enforcement of agreements purporting "to bar a consumer from bringing an action in . . . court[.]" *Id.* at 186 (quoting 15 U.S.C. § 1639c(e)(3)).

Like Citibank here, PNC relied on the series of Supreme Court cases "which have held that arbitration is not precluded merely because a statute provides a plaintiff with a cause of action." *Lyons*, 26 F.4th at 187 (citing *CompuCredit*, *Shearson*, and *Gilmer*). This Court explained that those "cases are inapposite" because while the statutes at issue in those cases "*authorize* a cause of action, § 1639c(e)(3) [of Dodd-Frank] *expressly prohibits* a covered agreement from *barring* a consumer 'from bringing an action'" in court." *Id.* "There is a substantive difference

between finding that arbitration is an appropriate alternative mechanism to enforce a statutorily created right to sue and overriding an express congressional command proscribing waiver of a specific judicial forum." *Id. Lyons* built on the language in *Mitsubishi Motors* explaining that a party must be held to an agreement to arbitrate unless Congress "has evinced an intention to *preclude a waiver* of judicial remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985) (emphasis added); *see also Gilmer*, 500 U.S. at 26.

Like the provision at issue in *Lyons*, § 4042(a)(3) does not just provide a cause of action, or even just the right to bring a class action in federal court—it expressly and specifically precludes the enforcement of contractual waivers to the contrary. *See Mitsubishi Motors*, 473 U.S. at 628. And just as in *Lyons*, there is a "substantive difference" between granting a right and precluding a waiver. Thus, under *Lyons*, the FAA cannot override Congress' clear and specific intent in § 4042(a)(3) to prohibit enforcement of pre-dispute class waivers.

*CompuCredit*, relied on by Citibank, is not to the contrary. The Credit Repair Organizations Act (CROA), at issue in *CompuCredit*, contains a right of action that, like many other statutes, is expressed in

terms of court proceedings. *See* 15 U.S.C. § 1679g. There is no dispute that such general language is insufficient to create an unwaivable right to a judicial forum. Nor is there any dispute that discussing what damages might be available in a class action—as CROA does—does not give rise to an unwaivable right to bring a class action. *See* 15 U.S.C. § 1679g(a)(2)(B). The potential twist in *CompuCredit* was that the statute required credit repair organizations to send notice to consumers of their "right to sue," but that section only afforded consumers the right to *receive* notice. 565 U.S. at 99. CROA also contains a general anti-waiver provision providing that consumer waivers of rights under CROA are void. 15 U.S.C. § 1679f(a). "But if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a 'right of a consumer'" prohibited by the statute. *CompuCredit*, 565 U.S. at 101. In sum, CROA's general cause of action language and general anti-waiver provision were insufficient to show that Congress intended to depart from the FAA's rule that parties, by contract, can choose to have statutory claims heard in a non-judicial forum subject to non-judicial rules.

Unlike CROA, § 4042(a)(3) not only creates a general cause of action, it *specifically* provides that servicemembers may bring class actions under the Federal Rules of Civil Procedure and *specifically* prohibits enforcing agreements purporting to take away those *specific* rights. That level of particularity—far from the general language in CROA but similar to that in Dodd-Frank at issue in *Lyons*—demonstrates Congress' intent to displace the usual background rules, including the FAA's rule that class waivers in arbitration agreements are generally enforceable.[8]

\*    \*    \*

For these reasons, § 4042(a)(3) prohibits the enforcement of pre-dispute class waivers for servicemembers with SCRA class claims, and the statute's incorporation of the Federal Rules of Civil Procedure means that those servicemembers may bring their cases in court. But even if

---

[8] The statute at issue in *Robertson v. Intratek Computer, Inc.*, 976 F.3d 575 (5th Cir. 2020)—also relied on by Citibank (at 32-34)—is distinguishable for the same reasons. In particular, while the statute referenced a jury trial, "the jury trial is not itself a 'right' or 'remedy' created by [the statute]." *Id.* at 580. Therefore, the statute's general prohibition on waivers of the "rights and remedies" available under the statute didn't extend to precluding waivers of jury trials. *Id.*

§ 4042(a)(3) were silent as to the venue for class adjudication, Citibank's agreement expressly precludes class arbitration: "If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative claim." JA89-90. Indeed, Citibank agrees that if the SCRA prohibits enforcing class waivers in arbitration clauses, its agreement requires that class proceedings take place in court. Citibank Br. 51.

**B.    Section 4042(a)(3) applies to Plaintiffs' claims because Citibank's arbitration agreements were entered into prior to this civil action.**

Because the statute makes clear that it governs the enforcement of "*any previous* agreement to the contrary," § 4042(a)(3) applies to Plaintiffs' post-enactment claims, regardless of whether Plaintiffs entered into agreements with Citibank before the statute's 2019 enactment. 50 U.S.C. § 4042(a)(3) (emphasis added). No further retroactivity analysis is required. Indeed, because § 4042(a)(3) governs contract *enforcement*, not *formation*, applying the statute here does not trigger any retroactivity analysis at all. But even if it did, such retroactive application would not impair Citibank's rights.

41

    *1.   No further retroactivity analysis is required because the statute expressly governs the enforcement of previous agreements.*

Congress made clear that § 4042(a)(3) applies regardless of whether the agreement containing a class-action waiver was entered into before or after the 2019 amendment, so long as it was entered into prior to the dispute. In analyzing whether to apply a statute to pre-enactment events, courts first consider "whether Congress has expressly prescribed the statute's proper reach." *Frontier-Kemper Constructors, Inc. v. Dir., Off. of Workers' Comp. Programs*, 876 F.3d 683, 688 (4th Cir. 2017) (cleaned up). "If it has, [courts] follow those express instructions." *Id.*

Here, Congress provided that servicemembers may "in a civil action" bring SCRA class actions, "notwithstanding any previous agreement to the contrary." 50 U.S.C. § 4042(a)(3). That language indicates that Congress meant to include all agreements entered into before the "civil action," whether or not they were formed before or after 2019. Citibank argues that Congress could not have meant "any previous agreement" to mean "*any* previous agreement"; rather, it says, Congress either meant agreements formed prior to the amendment's enactment or prior to the dispute, not both. Citibank Br. 46. But Citibank offers no

support for this nonsensical reading of the straightforward text. "Any previous" means "any previous," and all "previous agreements" are covered.

The legislative context of § 4042(a)(3) reinforces that Congress meant to refer to all pre-dispute agreements. As discussed above, the unenacted House version of the 2019 SCRA amendments would have directly addressed the enforceability of all arbitration agreements. S. Bill 1790 at § 550H. That provision was explicit that its requirements "shall apply with respect to contracts entered into, amended, altered, modified, renewed, or extended after the date of the enactment of this Act." *Id.* But § 4042(a)(3)—which immediately followed that section in the House bill—contained no such limitation, confirming that Congress did *not* intend to limit § 4042(a)(3) to contracts that post-dated its enactment.

> 2.    *Applying § 4042(a)(3) where the agreement predates the provision's enactment is not a retroactive application.*

But even if Congress was not clear that § 4042(a)(3) applies to class-waiver contracts entered into before that provision was enacted, applying § 4042(a)(3) to a pre-enactment agreement is not a retroactive application of the statute. That's because nothing in § 4042(a)(3) prohibits the *formation* of arbitration agreements, including arbitration

43

agreements, containing class waivers. Instead, the statute attaches legal consequences to a servicemember's filing of a class action.

"A statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (cleaned up). Instead, "[i]n deciding whether a statute has a retroactive effect, a court must determine the 'important event' to which the statute allegedly attaches new legal consequences." *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 251 (3d Cir. 2009).

Here, the "important event" is Plaintiffs' filing of a civil action for violations of the SCRA as class representatives—not forming an arbitration agreement with Citibank. The "new legal consequence" of § 4042(a)(3) is that when a servicemember files an SCRA class action, that action can proceed as a class action under the Federal Rules regardless of any prior agreement. *See* Pub. L. No. 116-92, div. A, title V § 547(b) (making clear that servicemembers have always had the right to bring class actions and indicating that the innovation of § 4042(a)(3) is to override agreements to the contrary). Citibank including an arbitration

agreement with a class waiver in its agreements remains legal under the SCRA. The text of § 4042(a)(3) attaches legal consequences to the filing of an SCRA class action, not the formation of class waiver agreements. *Cf. Deweese*, 590 F.3d at 245, 251 (finding that statute authorizing Amtrak to enforce indemnity agreements applied where the indemnity agreement predated statute because "important event" was "accrual of Amtrak's right to indemnification," "not the parties' execution of the [] Agreement").[9]

In short, because the legal consequences of § 4042(a)(3) arise upon the filing of an SCRA class action, no retroactivity analysis is triggered so long as the action is filed after the enactment of that provision. That

---

[9] Dodd-Frank illustrates the difference between statutes that impose a new legal consequence on the *formation* of contracts and those, like § 4042(a)(3), that impose new legal consequence on the interpretation and application of those contracts. Section 1639c(e)(1) prohibits mortgage loans from "includ[ing] terms which require arbitration." 15 U.S.C. § 1639c(e)(1). The "important event" for that provision is the formation of the agreement, and a retroactivity analysis would be needed to determine whether a loan that pre-dates Dodd-Frank would be covered. In contrast, § 1639c(e)(3) provides that no mortgage agreement "shall be applied or interpreted so as to bar a consumer from bringing an action in" court. 15 U.S.C. § 1639c(e)(3). There, the "important event" is not the formation but the interpretation or application of that contract, and there wouldn't be any retroactivity concern applying it in the context of an agreement formed before Dodd-Frank.

is consistent with the straightforward language Congress used in the statute.

> 3.    *Even if a retroactivity analysis were warranted, applying § 4042(a)(3) has no retroactive effect.*

Even if Citibank is right that an arbitration agreement with a class-action waiver pre-dating the 2019 SCRA amendment triggers further retroactivity analysis, the statute wouldn't have a retroactive effect because it doesn't "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Gordon*, 637 F.3d at 459 (quoting *Landgraf*, 511 U.S. at 280) (cleaned up). "[A] statute only operates retroactively "when it attaches new legal consequences to events completed before its enactment." *Id.* (cleaned up).

Following these principles, this Court held that the 2010 amendment adding a private of action to the SCRA did not operate retroactively and could be applied in a pending case. *Id.* at 461. The amendment did "not alter the rights, liabilities, or duties of [the parties]"—the legal duties of the towing company under the statute remained the same, and the servicemember already had a right of action under state law. *Id.* As such, it amounted to nothing more than

46

expanding jurisdiction to add the ability to bring claims in federal court, and it had no retroactive effect. *Id.*

Consistent with *Gordon*, statutes "conferring or ousting jurisdiction" "take[] away no substantive right"; they "simply change[] the tribunal that is to hear the case," and therefore are "regularly applied" regardless of "when the underlying conduct occurred." *Landgraf*, 511 U.S. at 274. That principle applies with full force in the context of arbitration because by "agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum." *Gilmer*, 500 U.S. at 26 (cleaned up); *see also Preston v. Ferrer*, 552 U.S. 346, 359 (2008). Or, as another court put it, the "right to have a dispute heard in an arbitral forum is a *procedural* right that affects the forum that will decide the substantive rights of the parties." *Wong v. CKX, Inc.*, 890 F.Supp.2d 411, 423 (S.D.N.Y. 2012) (emphasis added). "Changes in procedural rules"—like the right to bring a class action—don't "rais[e] concerns about retroactivity" for substantive rights because they "regulate secondary rather than primary conduct." *Landgraf*, 511 U.S. at 275.

Section 4042(a)(3) applies to pre-existing arbitration agreements with class waivers because it does not affect the substantive rights of parties to those agreements. It merely changes the procedural rules—whether class proceedings under the Federal Rules are guaranteed—and, where an arbitration agreement with a class waiver is concerned, the forum. As such, the statute has no retroactive effect, regardless of when a pre-dispute agreement was entered into.

Citibank has no argument whatsoever that, in the context of stand-alone class waivers, § 4042(a)(3) has no retroactive effect and applies to pre-enactment agreements. It also cannot contest the principle that changes in procedures and fora—the only two things § 4042(a)(3) addresses—have no retroactive effect. All it offers is the argument that, where arbitration agreements are involved, the regular principles of retroactivity are suspended. That is, that even though only changes regarding fora and procedures are at issue, they are transfigured into substantive rights because there is an arbitration agreement involved. But arbitration law cannot bear that weight.

Section 2 of the FAA governs the "substantive law of arbitrability," *Perry v. Thomas*, 482 U.S. 483, 489 (1987), just as any law governing the

48

enforcement of contracts is substantive. And the heart of the FAA's substantive law is that agreements to arbitrate are "on an equal footing with other contracts." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Indeed, the Supreme Court recently stressed that federal courts must treat arbitration agreements the same as other contracts and that the FAA does not authorize "courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). Thus, the normal retroactivity rules apply.[10]

## C. Under § 4042(a)(3), the entirety of Plaintiffs' "civil action" may be brought as a class action in court.

All of Plaintiffs' class claims, including their non-SCRA claims, can proceed on a class basis in court. Section 4042(a)(3)'s prohibition on the enforcement of pre-dispute class waivers applies to the entirety of a

---

[10] Although this Court hasn't addressed whether statutes eliminating the enforceability of arbitration agreements have retroactive effect, numerous district courts have held that because arbitration impacts only the forum, such statutes have no retroactive effect and apply to pre-enactment agreements. *See, e.g.*, *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 2023 WL 2740846, at *6 n.5 (E.D.N.Y. Mar. 31, 2023); *Lysik v. Citibank, N.A.*, 2017 WL 4164037, at *4 (N.D. Ill. Sept. 20, 2017); *Abhyankar v. Countrywide Fin. Corp.*, 2013 WL 1494457, at *5 (ARB Mar. 29, 2013); *Wong*, 890 F.Supp.2d at 423; *Pezza v. Investors Capital Corp.*, 767 F.Supp.2d 225, 234 (D. Mass. 2011). *But see* Citibank Br. 44 (collecting cases reaching different result).

plaintiff's "civil action," which refers to the entire litigation rather than a particular claim. To start, Citibank raised its contrary argument (at 50-51) that Plaintiffs' non-SCRA claims could still be sent to arbitration for the first time on appeal, and this Court should not consider it. *See In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014).

On the merits, Citibank is wrong. True, where some claims are arbitrable and others not, the FAA generally requires that the arbitrable claims be arbitrated, even if adjudicating intertwined claims in court and arbitration would be inefficient. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). But the FAA's rule only applies if there is no "contrary congressional command." *CompuCredit*, 565 U.S. at 98. And § 4042(a)(3) is such a command.

The text of § 4042(a)(3) determines the scope of its effect. "Claims" and "action" have different meanings, and Congress' use of "action" rather than "claim" indicates its intent that the prohibition on enforcement of class waivers attach to a servicemember's entire "civil action," not just their SCRA claims. 50 U.S.C. § 4042(a)(3). As this Court has observed, "action" typically refers to "an entire case or suit," an understanding "grounded in the Federal Rules of Civil Procedure."

*Naturaland Trust v. Dakota Fin. LLC*, 41 F.4th 342, 348 (4th Cir. 2022) (cleaned up); *see also Brownback v. King*, 592 U.S. 209, 220 (2021) (Sotomayor, J., concurring) ("An 'action' refers to the whole of the lawsuit. Individual demands for relief within a lawsuit, by contrast, are 'claims.'"). Congress's choice of words should be given their full effect.

Courts' interpretations of EFASASHA—the statute that renders unenforceable arbitration agreements in the context of sexual assault and sexual harassment claims—are instructive. The statute makes a pre-dispute arbitration agreement invalid and unenforceable "with respect to a *case*" that "relates to the . . . sexual harassment dispute." 9 U.S.C. § 402(a) (emphasis added). Courts have thus concluded that plaintiffs' entire lawsuits—including claims other than those for sexual assault or harassment—stay in court. For example, *Johnson v. Everyrealm, Inc.*, 657 F.Supp.3d 535 (S.D.N.Y. 2023), the district court ruled that neither the plaintiff's sexual harassment claims *nor* his race and gender discrimination claims were arbitrable under EFASASHA. In reaching that result, *Johnson* reasoned that Congress deliberately used "case"—in contrast to "claims"—and "case" means "a suit or action in law or equity" and "captures the legal proceeding as an undivided whole." *Id.* at 559.

51

*Acccord Turner v. Tesla, Inc.*, __ F.Supp.3d __, 2023 WL 6150805, at *4-*5 (N.D. Cal. Aug. 11, 2023); *Watson v. Blaze Media LLC*, 2023 WL 5004144, at *2 (N.D. Tex. Aug. 3, 2023).[11]

Likewise here, because § 4042(a)(3) provides that a person with an SCRA claim may, in a "civil action"—a term functionally equivalent to "case"—bring class claims in court, all of Plaintiffs' class claims belong in court because they are all part of the same "civil action."

## II.    Under the MLA, Plaintiffs cannot be forced to arbitrate their claims.

This Court can also affirm the district court's denial of Citibank's motion to compel arbitration on the alternative ground, not reached below, that the MLA also prohibits arbitration of Plaintiffs' claims.

### A.    Because Plaintiffs used their Citibank credit cards while on active duty for purchases after October 2017, the MLA forecloses individual arbitration.

Because credit-card transactions are "extensions of credit," and each Plaintiff used their Citibank cards while on active duty after

---

[11] The right to have all one's claims heard in court under EFASASHA is not unfettered. At a minimum, the sexual assault or harassment claims must be plausible and the other claims must have been properly joined. *See Johnson*, 657 F.Supp.3d at 541, 562 n.23. There is no reason similar guardrails would not apply here.

October 2017—the effective date of the regulation bringing credit cards within the definition of "consumer credit"—those transactions are covered by the MLA. Because the MLA prohibits the formation and enforcement of arbitration agreements, Citibank's agreement cannot be enforced here.

Specifically, § 987(e) makes it "unlawful for any creditor to extend consumer credit" to a servicemember on the condition that the servicemember waive their "right to legal recourse under" the SCRA or "submit to arbitration[.]" 10 U.S.C. § 987(e)(2)-(3). Section 987(f), in turn, makes any "contract prohibited under this section [ ] void from the inception" and prohibits the enforcement of any agreement to arbitrate any "dispute involving the extension of consumer credit" against a servicemember, or anyone who was a servicemember at the time the agreement was made. 10 U.S.C. § 987(f)(3)-(4).

Under Supreme Court precedent, DoD regulations, and the common law of contracts, "extension of consumer credit" in the context of credit-card accounts includes use of a credit card to pay for transactions. Thus, because Plaintiffs used their Citibank cards for purchases while on active duty after October 2017, Citibank's credit terms were unlawful, its

arbitration clause is void, and its arbitration clause cannot be enforced against Plaintiffs.

   *1. "Extension of consumer credit" has a well-understood meaning that encompasses both opening a credit-card account and using a credit card.*

  Courts, including the Supreme Court, uniformly interpret "extension of consumer credit" to include credit-card transactions for purposes of TILA, and that interpretation applies here. In enacting the MLA, Congress tracked the phrases used in TILA, including "extension of consumer credit." *Compare* 10 U.S.C. § 987(e), (f)(4) (MLA), *with* 15 U.S.C. §§ 1606(a), 1637(a), 1666(a) (TILA). Congress can be presumed to have known and understood the Supreme Court's contemporaneous interpretation of the meaning of "extension of consumer credit"—and intended to invoke it—when it passed the MLA. *See Stokeling v. United States*, 139 S. Ct. 544, 551 (2019).

  Moreover, in 2015, when DoD expanded the MLA regulatory definition of "consumer credit," it intentionally aligned the MLA with the TILA regime, explaining its new regulations would ensure "consumer credit covered under the MLA would be defined consistently with credit that for decades has been subject to the disclosure requirements of

[TILA]." 80 Fed. Reg. at 43563; *see, e.g.*, 32 C.F.R. § 232.3(f)(2)(iv) (defining "consumer credit" with reference to TILA regulations). *See also* Consumer Fin. Prot. Bureau, *Military Lending Act (MLA) Interagency Examination Procedures—2015 Amendments* MLA 3 (Sept. 2016) ("It is DoD's intent that the term [consumer credit] as used in the MLA regulation should wherever possible be interpreted consistently with [TILA].").[12]

Thus, it is appropriate to look to the interpretation of "extension of consumer credit" under TILA to understand what Congress and DoD intended it to mean under the MLA. And the Supreme Court expressly held that it includes credit-card transactions. *Am. Express Co. v. Koerner*, 452 U.S. 233, 240-41 (1981). The Court explained that "for there to be an extension of consumer credit, there first must be an extension of 'credit.'" *Id.* It continued, "credit" under TILA "'means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.'" *Id.* at 241. Thus, a creditor "extends credit to an individual or an organization when it opens or renews an account, *as well as when the*

---

[12] https://files.consumerfinance.gov/f/documents/092016_cfpb_MLAExamManualUpdate.pdf

*cardholder actually uses the credit card to make purchases*. When the account is open or renewed, the creditor has granted a right 'to insure debt and defer its payment'; when the card is used, the creditor has allowed the cardholder 'to defer payment of debt.'" *Id.* (emphasis added); *see* 32 C.F.R. § 232.3(h) (MLA defining "credit" identically to TILA). *Koerner* could not have been clearer that "extension of consumer credit" in the credit-card context includes when the credit card is used for individual purchase transactions.

Citibank's dismissal of *Koerner* misreads the case. *See* Citibank Br. 61. Citibank says that *Koerner* declined to decide whether "extension of consumer credit" means the opening of an account or when each credit-card transaction is made. *Id.* That's wrong. *Koerner* flatly held that "extension of consumer credit" includes "when the cardholder uses the credit card to make purchases." 452 U.S. at 240-41. The dispute in *Koerner* was whether the particular "extension of credit" at issue was an "extension of *consumer* credit," such that TILA's protections would attach, because the credit-card account at issue was primarily used for business purposes rather than consumer expenses. *Id.* at 237-38, 241. What the Court said it didn't need to decide was whether the "relevant

56

extension of credit" for determining whether credit was *consumer* credit was "only the creation or renewal of the account" or also "transaction-by-transaction." *Id.* at 242. But both options, including individual credit card transactions, were "extensions of credit." *Id.* at 242-44.

Courts applying *Koerner* have uniformly understood that "extension of consumer credit" under TILA includes when a consumer uses a credit card to make a purchase.[13] As DoD intended, this Court should hold the same for the same phrase in the MLA.

### 2. *"Become obligated" also reflects that "extension of credit" includes credit-card transactions.*

The DoD regulation defining "covered borrower" supports the view that credit-card transactions are covered by the MLA. "Covered borrower" uses the phrase "become obligated," which, in the credit-

---

[13] *See Hess v. Citibank. (S. Dakota), N.A.*, 459 F.3d 837, 844 (8th Cir. 2006); *Roselen v. Home Performance All, Inc.*, 2020 WL 6363886, at *4 (M.D. Fla. Oct. 28. 2020); *Langenfeld v. Chase Bank USA, N.A.*, 537 F.Supp.2d 1181, 1198-99 (N.D. Okla. 2008); *Catanach v. Citi Cards/Bank*, 2008 WL 11451608, at *5 (D.N.M. Mar. 18, 2008); *Cunningham v. Bank One*, 487 F.Supp.2d 1189, 1195-96 (W.D. Wash. 2007); *Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F.Supp.2d 818, 829 (S.D. Tex. 2007). *See also Martin v. Wells Fargo Bank*, 91 Cal.App.4th 489, 499 (2001) (interpreting "extend credit" in a California statute).

context, is understood to mean when the consumer uses the card to make purchases, not when the account is opened.

The current regulations define "covered borrower" to mean "a consumer who, at the time the consumer becomes obligated on a consumer credit transaction *or* establishes an account for consumer credit," is an active-duty servicemember. 32 C.F.R. § 232.3(g)(1) (emphasis added). Thus, the relevant triggering event can be either when an account is opened *or* when the servicemember "becomes obligated on a transaction." As such, "opening an account" must mean something different than "becomes obligated on a transaction." DoD carries this framing—using "becomes obligated" with the disjunctive "or" "establishes an account" throughout the regulations. *See* 32 C.F.R. §§ 232.1(c)(2), 232.2(1), 232.3(g)(4).

When expanding "consumer credit" to include credit cards in 2015, DoD made clear that a consumer "becomes obligated on a transaction" when they use the credit card. 80 Fed. Reg. at 43578 ("Consumers typically do not become 'obligated' on credit cards . . . until the first transaction or a certain period after delivery of the card, as recognized under [TILA]."). Previously, the regulations had just used the "become

obligated" language, but DoD recognized that that language captured only the use of the card and not the opening of the account. DoD expanded the definition to ensure that the MLA covers servicemembers *both* at the time they open a credit-card account and at the time they that credit card. 80 Fed. Reg. at 43578, 43586.

Contract law is in accord. Under general principles of contract law, consumers enter into a contract for purposes of their credit card (*i.e.*, "become obligated") when they use the card, not when they open the account. The "issuance of a credit card is only an offer to extend credit, which is accepted upon *each purchase* by the credit-card owner." *Sharp Elec. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388, 393-94 (4th Cir. 2000).[14]

---

[14] *See also, e.g., In re Mercer*, 246 F.3d 391, 406 (5th Cir. 2001); *In re Ward*, 857 F.2d 1082, 1086-87 (6th Cir. 1988); *Jenkins v. Gen. Collection Co.*, 538 F.Supp.2d 1165, 1174 (D. Neb. 2008); *Bank of Am. v. Jarczyk*, 268 B.R. 17, 22 (W.D.N.Y. 2001); *In re Kemmer*, 315 B.R. 706, 714 (Bankr. E.D. Tenn. 2004); *Barclays Bank Del. v. Bamford*, 277 A.3d 151, 160-61 (Conn. App. Ct. 2022); *Citibank (S.D.) N.A. v. Covaci*, 2014 IL App (Ill. App. Ct. 2014) 140521-U, ¶ 30 n.2; *Garber v. Harris Trust & Savings Bank*, 432 N.E.2d 1309, 1312 (Ill. Ct. App. 1982).

3.  *The method for calculating the interest rate under the MLA is consistent with treating credit-card transactions as "extensions of consumer credit."*

The way the MLA calculates APR for purposes of the statute's interest rate cap further reinforces that "extension of consumer credit" includes credit-card transactions.

Section 987(b) prohibits creditors from imposing an annual percentage rate of interest (APR) greater than 36 percent "with respect to the consumer credit extended to" servicemembers. 10 U.S.C. § 987(b). Section 987(i)(4) provides that APR has the same meaning as it does in TILA. In turn, under TILA, APR can be calculated several different ways, depending on the circumstances, including "when the finance charge includes a charge relating to a specific transaction during the billing cycle." 214 C.F.R. § 1026.14(c); 80 Fed. Reg. at 43583 (explaining that APR under MLA for credit cards should be calculated using § 1026.14(c)-(d)). Indeed, DoD explained that, in the context of credit cards, a finance charge imposed for a "specific [credit-card] transaction, such as a cash advance transaction," could be counted toward the APR for that billing cycle, unless the fee fell under an exception. *Id.*

60

For DoD's explanation of how to calculate the APR for credit cards (including charges related to "specific transaction[s]") to align with the text of § 987(b) (limiting the interest rate "with respect to consumer credit extended"), "extension of consumer credit" must include consideration of specific credit-card transactions incurred well after the account is opened.

Because DoD considers individual credit-card transactions to be credit transactions, Citibank's reliance on DoD's commentary on imposing coverage assessment requirements only "at the outset of the transaction" is unhelpful to Citibank. Citibank Br. 58 (quoting 79 Fed. Reg. 58062, 58616 (Sept. 29, 2014)); *see also* 80 Fed. Reg. at 43579. Citibank's argument is circular: It presumes that by referring to existing agreements and the outset of transactions, DoD is only referring to the opening of a credit-card account. But that is belied by the structure of the MLA and its regulations.

> 4. *No parts of the regulatory framework, including the safe-harbor provision, are to the contrary.*

Citibank counters that the regulations' safe-harbor provision indicates that "extension of credit" means something entirely different under the MLA than it does under TILA or contract law. Citibank Br. 54-

61

57. Not so. Neither the text of the provision nor DoD's commentary rely on the premise that an "extension of credit" only occurs when a credit account is opened. Because the sole function of the safe-harbor provision is to provide an optional method of compliance for creditors, it has no bearing on what types of credit trigger MLA coverage.

Under the safe-harbor provision, creditors may choose to implement one of two methods for verifying whether a borrower is covered by the MLA: run a check against the DoD database or consult a consumer report from a nationwide consumer reporting agency. *See* 32 C.F.R. § 232.5(b)(2). The safe-harbor protection attaches after the creditor conducts one of the approved inquiries and then properly records its finding that a borrower was not covered by the MLA at any of the following times: 1) when a consumer initiates a transaction, 2) when the account opens, *or* 3) when credit is offered, as long as the consumer responds within 60 days. 32 C.F.R. § 232.5(b)(3)(i)-(iii). Thus, a coverage assessment when the account is opened is sufficient to shield a creditor from some liability, but it is neither required nor is it the exclusive method of qualifying for the safe-harbor provision's protection. *See, e.g.*,

32 C.F.R. § 232.5(b)(3)(i) (specifying that a creditor could also comply by running the check when the consumer "initiates the transaction").

As DoD explained, the safe-harbor provision exists solely to give creditors *the option* of using a "legally conclusive mechanism" to comply with the MLA. 80 Fed. Reg. at 43578. Alternatively, a creditor can choose to use their own, non-MLA approved, compliance procedure. *See* 32 C.F.R. § 232.5(a). However, if a creditor chooses their own method of checking status, they open themselves up to an evidentiary inquiry that considers whether the creditor had actual knowledge that the consumer was a covered borrower. The creditor must then show they were following the MLA at the time of the extension of credit. *See* 80 Fed. Reg at 43578.

For this scheme to makes sense, a borrower's coverage status cannot be tethered to the timing of the credit check at the opening of an account. All the safe-harbor provision does is shield borrowers from an "actual knowledge" inquiry. If the creditor has complied with § 232.5(b) then they "should be provided a safe harbor from liability under the MLA—*even if, in fact, that consumer is a covered borrower.*" *Id.* (emphasis added). Tellingly, Citibank has not argued that it complied with

63

§ 232.5(b) such that it warrants safe harbor protection. And, moreover, it had actual knowledge that each of the Plaintiffs here was on active duty.

Citibank also complains (at 56) that additional disclosures would have to be provided each time a servicemember swipes their card if each transaction is an extension of credit. Not so. The statute and regulations provide that the disclosures be provided *before* the borrower becomes obligated on the transaction, so this requirement could be satisfied at the outset of the account. *See* 10 U.S.C. § 987(c)(1); 32 C.F.R. § 232.1(c)(2).

Further, Citibank contends that the delayed effective date for the application of the 2015 regulations to credit cards somehow supports its view that "extension of consumer credit" does not mean credit-card transactions. Citibank Br. 54. But the longer delay for application to credit cards—until October 2017 instead of October 2016—indicates DoD understood it was a significant change that would take time to comply with. *See* 32 C.F.R. §§ 232.12, 232.13(c); *see also* 80 Fed. Reg. at 43591 (reasoning "creditors would need a substantial period of time to modify their operations in order to comply with the rule"). DoD also explained that it was extending the compliance date for credit extended "under a credit card account," further emphasizing that a credit-card account and

64

the extension of credit under such an account are not the same. 80 Fed.

Reg. at 43573.

**B.   Section 987(f)(4) of the MLA prohibits enforcing Citibank's arbitration agreement against Plaintiffs on active duty when this case was filed.**

Regardless of *when* Citibank extended credit to Plaintiffs, Citibank cannot compel arbitration of the claims of any Plaintiff on active duty at the time this case was filed. Section 987(f)(4) flatly prohibits the enforcement of any arbitration agreement involving a dispute about the extension of credit "against any covered member or dependent of such a member" regardless of when that agreement was formed. Because two of the Plaintiffs—Mr. Espin and Sergeant Bell—were on active-duty status when this case was filed, under § 987(f)(4), Citibank's arbitration agreement cannot be enforced against them, even if Citibank is correct (it isn't) that only the initial opening of a credit-card account is an extension of credit. *See* JA19-21.

In relevant part, § 987(f)(4) provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member

when the agreement was made." 10 U.S.C. § 987(f)(4). Because the statute is disjunctive, it covers both agreements that fall under the purview of the statute now (i.e., any person who is currently a covered member) as well as agreements that would have fallen under the MLA at the time they were made (*i.e.*, any person who *was* a covered member). Thus, like § 4042(a)(3) of the SCRA, the rights under § 987(f)(4) of the MLA attach at the time the arbitration agreement is sought to be enforced, not at its formation because the section dictates when an agreement "shall be enforceable." *See supra*, Part I.B.2. And, like § 4042(a)(3) of the SCRA, applying § 987(f)(4) to agreements involving extensions of credit that were not covered by the MLA at time of the extension of credit does not present a retroactivity problem. *See id.*

Finally, § 987(f)(4) precludes enforcement of Citibank's arbitration agreement for any Plaintiff or other class member who was on active duty when this case was filed in September 2022, regardless of whether they lose that status while the case is pending. Arbitration clauses are forum-selection clauses, and the facts relevant to forum are the facts as they stand at the time the suit commences. *See Prestige Wine & Spirits, Inc. v. Jules Robin, S.A.*, 686 F.Supp.103, 107 (D. Md. 1988).

\*     \*     \*

In enacting the MLA and promulgating its regulations, Congress and DoD intended to protect servicemembers, who face special challenges while on active duty, from arbitration agreements like the one Citibank seeks to enforce here. Under the well-established meanings of terms used in the MLA and its regulations, Plaintiffs' use of Citibank's credit cards while on active duty falls within the coverage of the statute, and Citibank's arbitration agreement cannot be enforced.

## CONCLUSION

For these reasons, the district court's decision denying Citibank's motion to compel arbitration should be affirmed.

April 3, 2024

Respectfully Submitted,

/s/  Leah M. Nicholls

Hannah Kieschnick
PUBLIC JUSTICE
475 14th St., Ste. 610
Oakland, CA 94612
(510) 622-8150

Knoll D. Lowney
Claire E. Tonry
SMITH & LOWNEY, PLLC
2317 E. John St.
Seattle, WA 98112
(206) 860-2883

Leah M. Nicholls
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
LNicholls@publicjustice.net

*Counsel for Plaintiffs-Appellees*

67

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) and Local Rule 32(b) because this brief contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

/s/   *Leah M. Nicholls*
Leah M. Nicholls
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that, on April 3, 2024, the foregoing Appellees' Response Brief was served on all parties or their counsel through the CM/ECF system.

/s/    *Leah M. Nicholls*
Leah M. Nicholls
*Counsel for Plaintiffs-Appellees*